UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

            - v. -

                                        16-CR-370 (S-1) (CM)

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

            Defendants.

– – – – – – – – – – – – – – – X


GOVERNMENT'S BRIEF ON THE SCOPE OF THE PROSECUTION TEAM


ANDREW WEISSMANN                          JEFFREY D. MARTINO
Chief                                     Chief, New York Office
Fraud Section, Criminal Division          Antitrust Division
United States Department of Justice       United States Department of Justice


Carol Sipperly                            Michael Koenig
Assistant Chief                           Trial Attorney
Alison L. Anderson                        Antitrust Division
Richard A. Powers                         United States Department of Justice
Trial Attorneys
Fraud Section, Criminal Division
United States Department of Justice

## <u>**Table of Contents**</u>

I.  Introduction ........................................................................................................................4

II. Background and Relevant Facts ...........................................................................................5

   A.  Discovery........................................................................................................................6

   B.  The Prosecution Team's Interaction with Foreign Authorities .............................................7

   C.  The Prosecution Team's Interaction with Domestic Authorities ........................................11

III. Applicable Law ...................................................................................................................13

   A.  The Government's Discovery Obligations ........................................................................13

   B.  *Brady* and a Joint Investigation ...................................................................................13

   C.  Rule 16 and a Joint Investigation ...................................................................................16

IV. Analysis .............................................................................................................................17

   A.  The Government will Review All Notes from Interviews ...................................................17

   B.  The Prosecution Team ...................................................................................................18

V.  Conclusion .........................................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................ 13

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................... 13

*Kyles v. Whitley*, 514 U.S. 419 (1995) ......................................................................... 13

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ......................................... 16, 18

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ................... 17, 21, 22, 23

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ............................... 17

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) .............. 14, 16, 20, 22

*United States v. Hutcher*, 622 F.2d 1083 (2d. Cir. 1980) ..................................... 13

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) ............................................ 13

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ......................... 14

*United States v. Norris*, 753 F. Supp. 2d 492 (E.D. Pa. 2010) ............................. 16

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ................................... 13, 17, 22

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ................................. 16

*United States. v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013) ........... 15, 16, 21, 23

## Rules

Rule 16(a)(1)(E) ........................................................................................................ 13

## I. Introduction

Defendants Connolly and Black's (collectively the "Defendants") position on who are members of the prosecution team in this case is overly broad and otherwise unsupported by the law in the Second Circuit.

In its initial discovery letter to the Defendants, provided on or shortly after each Defendant's initial appearance, the government identified the prosecution team as attorneys from the United States Department of Justice's Criminal Division Fraud Section and Antitrust Division, as well as agents from the Federal Bureau of Investigation's Washington Field Office (collectively, the "DOJ" or "government").  Defendants, however, have taken an alternate, more expansive view.  In discovery letters dated December 22, 2016 and January 4, 2017, Defendants Connolly and Black, respectively, asked the government to produce multiple categories of documents in the possession, custody or control of the "Prosecution Team," which they defined expansively to include the following entities:

- Department of Justice (DOJ);
- Federal Bureau of Investigation (FBI);
- United States Attorney's Office for the Southern District of New York;
- United States Attorney's Office for the Eastern District of New York;
- Commodities Futures Trading Commission (CFTC);
- Securities & Exchange Commission (SEC);
- New York State Department of Financial Services (DFS);
- United Kingdom's Financial Conduct Authority (FCA);
- United Kingdom's Serious Fraud Office (SFO);
- German Federal Financial Supervisory Authority (BaFin); and
- any other law enforcement or regulatory entity, domestic or foreign, with which there has been coordination or cooperation with the government, and any employee, agent, or representative of the same.

In essence, the Defendants' claim that any authority that investigated manipulation of the London Interbank Offered Rate (LIBOR) with whom the DOJ ever had "coordination or

cooperation" is a member of the prosecution team.  This simply is inconsistent with the law in this Circuit.

## II. Background and Relevant Facts

The superseding indictment pending before this Court springs from the DOJ's investigation into manipulation of the LIBOR at Deutsche Bank.  This investigation, which began in 2011, uncovered evidence that manipulation of the LIBOR and other reference rates at Deutsche Bank took place in multiple offices around the world, including here in the United States.  The superseding indictment alleges that Connolly, who worked as a supervisor in Deutsche Bank's New York office, and Black, who worked as a trader in the London Office, schemed and conspired with others in New York, London, and elsewhere, to defraud their trade counterparties by manipulating one of these reference rates, the U.S. Dollar ("USD") LIBOR. They manipulated the USD LIBOR by scheming with their coconspirators whose job it was to submit an honest USD LIBOR, a representation of where Deutsche Bank could borrow cash. Instead, their coconspirators – at Connolly and Black's direction – abused their position as a LIBOR panel bank and submitted a false or fraudulent USD LIBOR on the basis of what benefited Connolly's traders and Black's trading books, *i.e.* a number that would help them make more money.  The superseding indictment further alleges that in doing this Connolly, Black, and their coconspirators intended to, and did, defraud counterparties located in the United States, including several in New York, New York.  Connolly, Black, and their coconspirators not only defrauded the counterparties to their trades but also manipulated a rate upon which millions of U.S. student loans, mortgages, etc. are referenced to.

Because of the global nature of the many conspiracies within Deutsche Bank to manipulate the different reference rates, a number of regulatory and prosecutorial authorities

simultaneously, independently investigated this matter.  And, as is common in these types of investigations, the DOJ coordinated with agencies around the world, as well as in the United States, in an attempt to increase efficiency and reduce the burden on cooperating entities and third parties.  Among the various agencies that investigated Deutsche Bank, the DOJ, CFTC, FCA, and DFS independently settled with the bank on April 23, 2015.  Each of these agencies, however, is independent of the DOJ and has not acted as an arm of the prosecution in this case.

A. Discovery

From its investigation described above, the government has gathered and produced approximately 1.46 million documents; sixty interview reports for thirty four individuals (thirty individuals interviewed as part of this investigation and four additional individuals from other institutions who otherwise mentioned Deutsche Bank); a folder of "hot" documents; and other material to the Defendants in this case since their initial appearances.  Although the Defendants were only involved in, and charged with, manipulating the USD LIBOR, materials related to separate conspiracies within Deutsche Bank to manipulate other rates – for example, the Euroyen TIBOR, Swiss Franc LIBOR, or EURIBOR – were also included in these materials.

This material includes whatever the DOJ received from any other agency as part of the DOJ's investigation of Deutsche Bank that was considered discoverable as well as material gathered from the investigations into other banks where that material mentioned or included the Defendants, as potential Rule 16 material, or potential witnesses, as potential *Giglio*.  This material was produced in a load ready, searchable format and included over 20 metadata fields that identified things like the email sender, date, etc.  This means that the Defendants can run targeted searches in the database.  For example, they can easily search for emails that include a certain individual that took place on a specific date.

When producing this material, the government offered to work with the Defendants on any issues and additional requests. To that end, the government has had several phone calls and written correspondence with counsel to discuss and work through any and all technical issues with the discovery. The government has also run specific searches that have been requested by the Defendants and produced the results from those searches. Upon Defendants' request, the government also provided all relevant production cover letters received from other parties as well as an index of materials provided in this case.

Moving forward, and again in the spirit of working with the Defendants' requests and despite the government's position that some of this material is far outside of the government's discovery obligations, the government will be producing: the hot documents for investigations into the other financial institutions that the government investigated for potential similar reference rate manipulation; the interview reports from counter-party interviews (*i.e.* potential victims) in other bank investigations; metadata that the government has created so that defense counsel will readily know the origin of a document; trading data from the other bank investigations; and other materials.

### B. The Prosecution Team's Interaction with Foreign Authorities

Below is a list of the agencies either with whom the government coordinated during its investigation of Deutsche Bank or whom the Defendants highlighted in their letters as potential members of the prosecution team. The relationship of each agency with the government has been summarized to inform the court's decision on this issue. On rare occasions, the DOJ spoke with additional authorities other than those listed below but not to a degree that is relevant or warrants discussion.

The United Kingdom Serious Fraud Office (SFO): The SFO is an independent, foreign prosecuting office that is part of the UK criminal justice system. *See* https://www.sfo.gov.uk/about-us/. The DOJ and the SFO have conducted independent investigations and prosecutions in this case. The DOJ has interviewed thirty-four individuals in this and related cases. The SFO attended none of them. The DOJ does not know how many interviews the SFO conducted, but participated in none of them. In sum, the DOJ did not conduct any joint interviews with the SFO nor has the DOJ received any interview reports from the SFO. The DOJ recently shared several interview reports with the SFO well after the underlying interviews were concluded.

During its investigation, the DOJ sought material located in the UK and used the Mutual Legal Assistance Treaty (MLAT) with the UK to do so. In most cases, the government must turn to the MLAT process to retrieve overseas evidence needed in any international investigation and this process was required in this case as well. The SFO responded to the DOJ's MLAT request and assisted in the collection of documents. The SFO did not play any role in drafting these requests or negotiating the scope of the requests. Outside of the MLAT, the DOJ did not work with the SFO to gather documentary evidence.

As is common in investigations with potentially overlapping jurisdiction, the SFO and the DOJ had several discussions about the prosecutorial priorities of each agency. Over the course of several meetings, the SFO informed the DOJ of its investigative priorities – prosecuting criminal conspiracies related to reference rates that effected their citizens the most – and the DOJ in turn identified where its focus lay – prosecuting criminal conspiracies related to USD LIBOR as it effected U.S. citizens the most. These conversations were part of an effort to sort out potentially competing prosecutions of the same individuals. These conversations did not involve

discussions about which office had the better evidence or the best way to develop each case. And the decision of which individuals should be charged was made independently by each agency according to its own internal decision making process.  The DOJ and the SFO also discussed the possible effects of certain charging decisions on extradition.  The SFO ultimately charged six current and former Deutsche Bank employees in the UK for alleged manipulation of the Euro Interbank Offered Rate (EURIBOR). https://www.ft.com/content/d3083eda-228d-11e6-9d4d-c11776a5124d.  None of these individuals has been charged in the United States. Moreover, the DOJ is not participating in the prosecution of the EURIBOR cases in the UK. Similarly, the SFO is not participating in the prosecution of this case.

The United Kingdom Financial Conduct Authority (FCA): The FCA is an independent financial authority that oversees the financial service sector in the United Kingdom. *See* https://www.fca.org.uk/about/the-fca.  Under its authority as a financial regulator, the FCA has investigated LIBOR related misconduct at Deutsche Bank.

Throughout its investigation, the DOJ worked in parallel with regulators at the FCA. The DOJ and the FCA had discussions about interviews that focused on reducing any potential negative impact on the other's investigation.  The DOJ took this approach to avoid any potential negatives effects resulting from the FCA's use of compulsory process to conduct its interviews. To be clear, the DOJ did not participate in, gain possession of, discuss the contents of or review the transcript of FCA interviews of any current or former Deutsche Bank employees in this case. FCA investigators attended two out of the thirty-four DOJ interviews related to this case, including the interview of defendant Connolly.  In the instances where the FCA attended a DOJ interview, the DOJ shared these reports with the FCA because of the DOJ's practice of only using an FBI agent to take notes during the interview.

The DOJ did not direct the FCA to collect documents on its behalf nor does it have access to the FCA's files.  When the FCA shared Deutsche Bank-related documents with the Commodity Futures Trading Commission (CFTC), the DOJ was able to receive this material possessed by the CFTC under an access request letter.

The DOJ did not discuss its strategy for prosecuting this case with the FCA.  The FCA was not involved in any plea negotiations in this case and did not play a role in deciding who should be prosecuted.  Similarly, the DOJ did not discuss whom the FCA should proceed against in its enforcement actions or what findings it should make.  As is common in large corporate resolutions and pursuant to Deutsche Bank's request for coordinated resolutions, the DOJ and the FCA discussed the timing of the resolutions.  The FCA and the DOJ kept each other informed of possible resolution timelines and whether the other could settle with the bank on a similar schedule.

Bundesanstalt für Finanzdienstleistungs-aufsicht or German Federal Financial Supervisory Authority (BaFin): BaFin is an independent financial regulator in Germany that has supervisory authority over Deutsche Bank. *See* https://www.bafin.de/EN/DieBaFin/AufgabenGeschichte/aufgabengeschichte_node_en.html. The DOJ did not engage in fact gathering with BaFin.  There was no coordination between the DOJ and BaFin about interviews, document requests, or any other investigative steps.  On occasion during its investigation, the DOJ spoke with BaFin when regulatory issues arose for Deutsche Bank based on the DOJ's investigation and corporate resolution.

C. The Prosecution Team's Interaction with Domestic Authorities[1]

The Securities and Exchange Commission (SEC): The SEC is an independent regulatory authority over which the DOJ exercises no control.  Early in 2010, the DOJ submitted an access request letter to the SEC for its investigation into LIBOR manipulation generally.  The DOJ did not conduct a parallel investigation into Deutsche Bank with the SEC or engage in fact gathering with the SEC for LIBOR-related misconduct at Deutsche Bank.  The DOJ did not receive Deutsche Bank-related documents from, or conduct any joint interviews with, the SEC.

The New York Department of Financial Services (DFS): The DFS is an independent authority responsible for supervising financial institutions operating in New York.  *See* http://www.dfs.ny.gov/about/whowesupervise.htm.  The DOJ did not conduct a parallel investigation with the DFS.  The DOJ never received documents from the DFS or conducted interviews with the DFS, nor did the DOJ provide interview reports to the DFS.  The DOJ had limited conversations with the DFS prior to the corporate resolution with Deutsche Bank.

The Commodity Futures Exchange Commission (CFTC): The CFTC is an independent authority responsible for regulating futures trading as well as guarding against abuses in the derivatives market. *See* http://www.cftc.gov/About/MissionResponsibilities/index.htm.  The CFTC's investigation into LIBOR manipulation began in mid-2008.  In April 2010, the DOJ submitted an access request letter to the CFTC as part of its investigation into LIBOR manipulation generally.  From this access request letter, the DOJ has received hundreds of thousands of documents throughout the course of its investigation of Deutsche Bank, all of which have been produced to the defendants where the government is obligated to do so, along

---

[1] No attorney from either the Southern or Eastern Districts of New York has participated in the prosecution of this case.

11

with accompanying cover letters from the CFTC and an index of this material.  The DOJ did not direct the CFTC's document requests or identify material for the CFTC to gather on its behalf. The documentary evidence generally flowed in one direction, *i.e.* the DOJ did not share material that it collected with the CFTC.

The DOJ and the CFTC discussed which individuals each planned to interview as well as the timing of such interviews but did not discuss strategy in the broader context of the best way to prosecute the case.  Overall, the CFTC participated in thirteen of the thirty-four interviews related to Deutsche Bank; however, it has not participated in an interview since the corporate resolution in April 2015.  During these interviews, including those where a CFTC attorney was present, there was a single note taker—an FBI agent.  And DOJ made interview reports from such interviews available to the CFTC.

The DOJ did not discuss its strategy for prosecuting this case with the CFTC.  The CFTC was not involved in any plea negotiations in this case and did not play a role in deciding which individuals or entities should be prosecuted.  Similarly, the DOJ did not discuss which individuals or entities the CFTC should pursue in enforcement actions or what findings it should make.  And as is common in large corporate resolutions, and at the request of Deutsche Bank for coordinated resolutions, the DOJ and the CFTC discussed the timing of the resolutions.  The CFTC and the DOJ kept each other informed of resolution timeline and whether the other could settle with the bank on a similar schedule.  While there was a CFTC employee on detail at the Fraud Section who worked on this case, he worked only in his capacity as a Fraud Section Attorney (he never worked on the matter in his capacity as a CFTC employee) and no CFTC employee has been made a Special Assistant United States Attorney for the prosecution of this case.

### III. APPLICABLE LAW

A. The Government's Discovery Obligations

A prosecutor has a constitutional duty to search for and disclose any favorable evidence (*i.e.*, exculpatory or impeachment information under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)) known to the others acting on the government's behalf in the investigation or prosecution of the case. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Under Rule 16(a)(1)(E), the government must, upon request, permit the defendant to inspect and to copy, *inter alia*, documents and papers, "if the item is within the government's possession, custody, or control" and "the item is material to preparing the defense." These obligations, however, do not find their out marker at the edge of a defendant's imagination. *See United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) ("The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.").

B. *Brady* and a Joint Investigation

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only where the Government conducts a "joint investigation" with another state or federal agency. *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC). And the Second Circuit has rejected "a notion of possession which is so elastic as to embrace materials that the prosecution has *never had in its*

*files, never inspected, and never knew about.*" *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d. Cir. 1980) (emphasis added).

Although the case law on joint versus parallel investigations is somewhat inconsistent, a common theme is that the analysis requires a tailored approach looking at the facts of each case, the facts that were jointly gathered, the existence of joint decision making, and whether the prosecutor exercised sufficient control over another agency such that knowledge should be imputed. Two recent cases in this District attempted to determine whether parallel investigations became joint through an analysis of the ways in which the agencies gathered relevant facts and the specific requests at issue. These cases, however, should be read in light of the actual material requested by the defendants and the limited rulings by each court.

In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), the defendant sought any *Brady* or *Giglio* material contained in contemporaneous interview notes or memoranda created by attorneys from the SEC present at "joint interviews." *Id*. at 493. In finding that the government had to review SEC notes from the jointly conducted interviews for *Brady* and *Giglio*, Judge Rakoff clarified that where prosecutors and federal agencies choose to engage in extensive joint fact-gathering efforts, despite running parallel investigations, it "does not mean that all of the documents the [agency] prepare[s] and accumulate[s] in its investigation ... are part of the joint investigation." *Gupta*, 848 F. Supp. 2d at 494-95. Instead, only documents "arising from those joint efforts" are rightly considered within the prosecutor's constructive possession. *Id*. Thus, information that is not the result of joint fact gathering or is independently obtained by another agency in a parallel investigation should be considered beyond what is part of the joint investigation and therefore, not within the government's possession or control.

Again, the facts of each case and the request at issue are key to understanding a court's view on the government's obligations.  In *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), the court addressed a narrow and specific request by the defendant: that the government review for *Brady* any notes and memoranda of communications between the SEC and counsel for the cooperating witnesses that were in the sole custody of the SEC that related to threats of criminal prosecution or promises related to non-prosecution agreements. *Id*. at 459. Somewhat at odds with the holding in *Gupta*, but similar in its narrow application, Judge Gardephe held that the fact that "the agencies [were] engaged in joint fact-gathering" required the government to review a narrow subset of memoranda related to conversations in which the government was not involved at all. *Id*. at 462.  As described above, the requests at issue in *Martoma* were narrow in scope (more so than in *Gupta*) and the court's ruling placed a minimal burden on the prosecution to search in files that it otherwise did not possess or control.  But that holding should not be extrapolated to create a boundless obligation on the part of the government in all parallel investigations.  Such a result would destroy any efficiencies gained through parallel investigations and would create an onerous and untenable burden on the government to try and gain access to and then review files that it otherwise never reviewed or had access to.

Courts also focus on the scope of the relationship in deciding what is known by the prosecutors.  In *Meregildo*, Judge Pauley discussed the question of imputation in terms of agency—who are the agents of the prosecution whose knowledge should be imputed to the principal.  *United States v. Meregildo*, 920 F. Supp. 2d 434, 443-44 (S.D.N.Y. 2013).  ("In the Second Circuit, a prosecutor's constructive knowledge only extends to those individuals who are 'an arm of the prosecutor' or part of the 'prosecution team.'" *Id*. at 440-41).  There the court held that a cooperating witness was not a member of the prosecution team or an arm of the prosecutor

because he never participated in formulating trial strategy nor was he directed to investigate. *Id*.
at 445. "A prosecution team may have many members with different responsibilities. At its
core, members of the team perform investigative duties and make strategic decisions about the
prosecution of the case." *Id*. at 441. It makes eminent sense that the agency relationship between
an investigating agency, such as the FBI, and a prosecutor is sufficiently strong to impute
knowledge from the former to the latter. *See Id*. at 444. But it is untenable to attribute
knowledge to the prosecutors for material in the possession of an outside agency – an agency that
had no input on "strategic decisions about the prosecution of the case" – that it 1) did not have
ready access to and 2) never reviewed. Moreover, this view is consistent with *Gupta* where the
concern centered on whether an additional report or record of a jointly conducted interview
existed that evidenced either previously undisclosed *Brady* or itself could be considered *Giglio*
material. *See Gupta* 848 F. Supp. 2d at 495.

### C. Rule 16 and a Joint Investigation

The joint investigation inquiry is further curtailed in the context of Rule 16 because "[t]he
Government's discovery obligations and *Brady* obligations are not coterminous." *Meregildo*, 920
F. Supp. 2d at 443. Rule 16 and *Brady* address separate interest and rights and should not be
read as identical in scope. *Id*. It follows, then, that the scope of possession under Rule 16
(beyond actual possession) should be read to be even narrower than as it is under a *Brady* (or
*Giglio*) analysis. *See United States v. Norris*, 753 F. Supp. 2d 492, 530 n. 21 (E.D. Pa. 2010).

Yet, similar to the analysis under *Brady*, the government's obligations under Rule 16
generally focuses on the extent to which there was a "joint investigation." *See United States v.
Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994). The joint investigation test, however, was
not designed to err on the side of creating a monolithic view of the government. In both the

*Brady* and Rule 16 context, courts have expressed concern about the effect of a "monolithic view of the government" that would functionally paralyze the prosecution of criminal cases. *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 n. 3 (S.D.N.Y. 2006) . Rather, the joint investigation test merely prevents prosecutors from accessing and reviewing material without taking possession, and then later disclaiming discovery obligations with respect to that same material. *See Finnerty*, 411 F. Supp. 2d at 434 (citing *United States v. Giffen*, 379 F. Supp. 2d 337, 342-43 (S.D.N.Y. 2004)).

Again looking at these issues on a case-by-case basis, courts in the Second Circuit have focused on what the government reviewed or had ready access to.  For example, in *Finnerty*, Judge Chin held that the government was responsible for producing documents in the possession of another agency that it had actually reviewed. *See Finnerty*, 411 F. Supp. 2d at 434.  Other courts have focused on whether or not the government is aware of the information's existence when deciding the question of what it must produce.  *See Giffen*, 379 F. Supp. 2d at 343.  At the very least, the government should not be required to make available material in the possession of another agency that the government 1) did not direct the collection of; 2) has never possessed; and 3) has never reviewed. *See United States v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009).

## IV. ANALYSIS

### A. The Government will Review All Notes From Interviews

As a threshold matter, and regardless of the Court's ultimate ruling on the scope of the prosecution team, the government – because it takes seriously its discovery obligations– will collect and review for *Brady* and *Giglio* material any notes taken by representatives from other agencies (here, the CFTC and FCA) that were present during DOJ interviews, if such notes

exist.[2]  If those notes exist and contain *Brady* and *Giglio* material, the government will provide

the information to the Defendants in a timely fashion.  And should the Defendants make

reasonable and relevant requests for specific, readily identifiable information in the sole

possession of another authority, the government will make good faith efforts to assist the

Defendants in collecting this information.

### B. The Prosecution Team

That said, the Defendants' definition of the prosecution team is overly broad and not

supported by the facts or the law.  None of the agencies or entities referred to by the Defendants

are members of the prosecution team for *Brady*, *Giglio*, or Rule 16 purposes and the DOJ does

not constructively possess whatever material these agencies gathered during their independent

investigations.  Anything that was actually provided to the DOJ from these agencies has been

included in the on-going assessment of the government's discovery obligations and productions.

During its investigation, the DOJ coordinated with other agencies for the sake of efficiency and

took efforts not to create a joint prosecution team.  But this necessary coordination is not

tantamount to joint investigating and such a conclusion would run the risk of paralyzing the

prosecution of transnational financial crimes which unequivocally requires coordination with

numerous foreign and domestic authorities.  *See United States v. Avellino*, 136 F.3d 249, 255 (2d

Cir. 1998).

---

[2] It was the government's practice that when the CFTC or FCA attended a DOJ witness
interview, the sole note-taker was an FBI agent who then wrote an investigative report.  While
the CFTC and FCA have previously indicated that they took no notes during witness interviews
attended by the DOJ, the government recently renewed a request that the CFTC and FCA re-
confirm that they have no contemporaneous notes from DOJ witness interviews.

As an initial matter, neither Bafin, the DFS, nor the SEC jointly – or even in parallel – investigated any of the conduct at issue in this case with the DOJ.  The analysis, therefore, is better focused on the agencies with whom the DOJ had more regular communications.

SFO: The SFO is an independent prosecuting office that made independent charging decisions in this case and is an agency over which the DOJ cannot and did not exercise control. The DOJ never reviewed the SFO's files, never conducted an interview with them and did not coordinate the collection of material with them beyond the routine use of an MLAT.

Investigating conduct that occurred, in part, overseas requires coordinating and working with foreign authorities because collecting foreign-located evidence usually requires using various formal processes such as a MLAT.  But use of a MLAT is not the same as joint fact gathering.  In preparing its request, the DOJ and SFO did not discuss strategy or confer as to which documents the DOJ would seek.  The DOJ does not know what material the SFO sought for its own investigation and has not had access to the SFO's files.  And the DOJ certainly did not direct any aspect of the SFO's investigation.

Defendants have argued that certain conversations between the DOJ and SFO about charging decisions place the SFO on the prosecution team. *See* Status Conf. Tr. 8, January 18, 2017.  This simply is not the case.  As an initial matter, these discussions were high-level and related to general conspiracies (*i.e.* the conspiracy to manipulate EURIBOR vs. USD LIBOR), and was not a discussion of which individuals should or should not be charged.  Common sense dictates that criminal authorities with overlapping jurisdiction should have conversations about priorities, especially where disposition in one jurisdiction could act as a bar to extradition to another.  Moreover, these conversations highlight that the prosecutions are in fact separate.  It seems counterintuitive that a joint investigation or prosecution is created when independent

prosecuting authorities discuss individual priorities to avoid competing prosecutions that would waste resources for each sovereign.  To that end, the SFO has charged six former Deutsche Bank employees for manipulating EURIBOR and is proceeding to trial in the UK—a trial where the DOJ has no involvement.  Similarly, the SFO has no role as a member of the prosecution team in this case.

It is also instructive to understand conversations that the DOJ and the SFO did <u>not</u> have. The DOJ and the SFO did not discuss a myriad of topics that would be routine for a joint investigation and prosecution, including: the strategy for collecting evidence (*e.g.* subpoenas, search warrants, etc.); the strategy for approaching witness interviews; who should be approached about cooperating; who should be offered a non-prosecution agreement; or what charges are appropriate.  These conversations did not happen because there was no joint investigation or prosecution.  Instead, the coordination between the DOJ and the SFO was the necessary and appropriate discourse required to de-conflict the jurisdictional overlap between two independent prosecuting authorities.

FCA: The DOJ conducted a parallel rather than a joint investigation with the FCA.  As previously mentioned, for the two interviews where the FCA participated, the DOJ will review any notes taken by an employee of the FCA to the extent they exist.  Also, any Deutsche Bank evidence that flowed from the FCA to the DOJ has already been considered to be within the government's possession when making our current discovery determinations.  Additional independently gathered material in the files of the FCA would be beyond what was reviewed or utilized by the prosecution and thus is not discoverable.  *See Gupta*, 848 F. Supp. 2d at 495.

Although the DOJ and FCA worked in parallel and coordinated during the investigation, each made independent decisions in this investigation.  The DOJ did not direct the FCA as to

what information to collect nor did it direct the FCA to gather material on its behalf.  The DOJ did not discuss with the FCA what investigative techniques the DOJ planned on using to collect evidence (*e.g.* subpoenas, search warrants, etc.).  What evidence the DOJ independently collected, it did not share with the FCA.  The DOJ has not had and does not have access to the FCA's files and has not reviewed them.  Similarly, the FCA has not had and does not have access to the DOJ's files.  And the DOJ has not received or reviewed any interview material generated by the FCA as part of its Deutsche Bank investigation.

Both the DOJ and the FCA made independent decisions on how to investigate and prosecute their respective cases.  The FCA did not participate in DOJ strategic decision making such as who should be offered cooperation agreements or non-prosecution agreements or who should be charged.  *See Meregildo*, 920 F. Supp 2d at 441.  The DOJ did not strategize with the FCA about what enforcement actions it should bring both against Deutsche Bank or its former employees.  The coordination that did occur between the FCA and DOJ was necessary to reduce any inefficiencies or conflicts that could have come from competing demands from agencies to gather the same evidence from an entity or individual.  But this coordination does not equate to joint investigating and should not result in an expanded discovery obligation for the government over material that it never had ready access to or reviewed. *See Finnerty*, 411 F. Supp. 2d at 434.

The CFTC: The DOJ and CFTC conducted parallel investigations into Deutsche Bank and the CFTC has not participated in the prosecution of this case.  As mentioned above, for any DOJ interviews attended by the CFTC, the government will review any notes taken by an attorney from the CFTC for discoverable material.  And the government has considered any

material that it received from the CFTC via the access request letter related to the investigation of Deutsche Bank in making its discovery determinations.[3]

Beyond what the government has produced and promises to produce, the Court should not find constructive possession by or impute knowledge from the CFTC to the DOJ for the files over which the government has not reviewed or had ready access to during the investigation. *See Gupta*, 848 F. Supp. 2d at 495.  Additional material in the possession of the CFTC beyond what the DOJ received via the access request letter would be evidence that the DOJ 1) did not direct the collection of; 2) has never possessed; and 3) has never reviewed.  *See Rigas*, 583 F.3d at 126. Requiring production of this additional material would be an overly broad definition of the government where the prosecution team has not had access to the material and is not using lack of physical possession as a technicality to avoid disclosure obligations.  *See Finnerty*, 411 F. Supp. 2d at 434.

The CFTC is not a member of the prosecution team because it operated pursuant to its own mandate and authority and did not act as an arm of the prosecution team.  The CFTC made independent decisions during its investigation about whom to investigate and how.  For example, the DOJ did not tell the CFTC what documents to request or whom it should or should not interview.  The DOJ did not discuss with the CFTC what investigative techniques it planned on using to collect evidence (*e.g.* subpoenas, search warrants, etc.).  What evidence the DOJ independently collected, it did not share with the CFTC.  The DOJ did not seek and obtain a Rule 6(e) order to share Grand Jury material with the CFTC.  Nor did the DOJ designate a CFTC

---

[3] The government does not believe that material received from the CFTC via the access request letter is jointly gathered, especially where the government did not direct the collection.  *See Finnerty*, 411 F. Supp. 2d at 434.  But this material is certainly in the possession of the government for discovery purposes and has been produced accordingly.

attorney as a "SAUSA" for prosecution of this case.  Although the DOJ and the CFTC conducted multiple interviews together, the DOJ will review any notes – to the extent they exist – taken by a CFTC attorney in these interviews for *Brady* and *Giglio* material.  Notably, the CFTC ceased participating in interviews after the resolutions with Deutsche Bank in April 2015.  Indeed, before the corporate resolutions only one interview took place with a cooperating witnesses who is expected to testify in this case.  Outside of that interview, the CFTC has not attended an interview with a cooperating witness expected to testify in this case.  This shows that the CFTC independently decided what it did and did not want to investigate in this case.

Both the DOJ and the CFTC made independent decisions on what enforcement actions to take based on their respective internal processes.  The CFTC did not participate in DOJ strategic decision making such as who should be offered cooperation agreements or non-prosecution agreements or who should be charged.  *See Meregildo*, 920 F. Supp. 2d at 441.  The DOJ did not dictate to or strategize with the CFTC about what enforcement actions it should bring both against Deutsche Bank or its former employees.  The coordination that did occur between the CFTC and DOJ during the investigation was necessary to reduce any inefficiencies or conflicts that could have come from competing demands from agencies to gather the same evidence from an entity or individual.  But this coordination does not equate to joint investigating and should not result in an expanded discovery obligation for the government over material that it never had ready access to or reviewed.  *See Finnerty*, 411 F. Supp. 2d at 434.

The independence of the DOJ and CFTC in this case coupled with the discovery produced to date and the commitment by the government to review any potentially existing notes from interviews that the CFTC attended satisfies the government's discovery obligations with respect to the CFTC.

23

**V. Conclusion**

For the foregoing reasons, this Court should find that the prosecution team consists of attorneys from the United States Department of Justice's Criminal Division Fraud Section and Antitrust Division, as well as agents from the Federal Bureau of Investigation's Washington Field Office.

Dated: February 1, 2017

      New York, New York


                                        Respectfully submitted,


| | |
|---|---|
| ANDREW WEISSMANN | JEFFREY D. MARTINO |
| Chief, Fraud Section | Chief, New York Office |
| Criminal Division | Antitrust Division |
| United States Department of Justice | United States Department of Justice |
| | |
| _____/s/_____ | _____/s/_____ |
| CAROL L. SIPPERLY | MICHAEL T. KOENIG |
| Assistant Chief | Trial Attorney |
| ALISON L. ANDERSON | Antitrust Division |
| RICHARD A. POWERS | United States Department of Justice |
| Trial Attorneys | |
| Criminal Division, Fraud Section | |
| United States Department of Justice | |
| (718) 254-6313 | |