**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    *v.*<br><br>MATTHEW CONNOLLY AND<br>GAVIN BLACK,<br><br>      *Defendants.* | )<br>)<br>)<br>)<br>)   No. 16-cr-370 (CM)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'**
**MOTION FOR *CURCIO* HEARING**

The Court should grant the government's motion and hold a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), to resolve actual and potential conflicts of interest that arise from Kenneth Breen's and Paul Hastings LLP's representation of defendant Matthew Connolly and their representation of Morgan Stanley. The government has conferred with counsel for Mr. Connolly, but the parties are at an impasse as to whether the conflict issue is ripe for the Court to hold a *Curcio* hearing. Although the record requires further development to determine whether the conflicts are disqualifying or waivable, the government is aware of the following facts:

(1)    Mr. Breen and his firm, Paul Hastings, represent Mr. Connolly in the above-captioned matter, where he stands accused of participating in a fraudulent scheme to manipulate LIBOR;

(2)    Morgan Stanley is a victim of Mr. Connolly's fraudulent scheme to manipulate LIBOR;

(3)     Paul Hastings currently represents Morgan Stanley with respect to matters outside

the context of both this matter and the government's LIBOR investigations

generally;

(4)     Mr. Breen and Paul Hastings formerly represented Morgan Stanley in the

government's LIBOR investigations and, in that capacity, represented Morgan

Stanley at an FBI interview of a former employee, M.B., who was the head of

Morgan Stanley's swaps desk during a substantial portion of the conspiracy;

(5)     M.B. is a potential testifying witness for the prosecution and, if called, would

testify about swap trades between Morgan Stanley and Deutsche Bank that had

reset dates at issue in this matter;

(6)     Morgan Stanley provided Mr. Breen and Paul Hastings a heavily conditioned

consent letter for their representation of Mr. Connolly in this matter; and

(7)     Mr. Breen anticipates that he will be able to obtain a conflict waiver from

Mr. Connolly.

Because the facts summarized above and explained in further detail below strongly

suggest the existence of actual and potential conflicts of interest, the government submits that a

*Curcio* hearing is warranted to determine the scope of any and all conflicts, whether the conflicts

can be waived, and whether Mr. Connolly's anticipated waiver is knowing and intelligent.

## BACKGROUND

As part of several long-running investigations into LIBOR manipulation, the Department

of Justice and the Federal Bureau of Investigation interviewed (and continue to interview)

numerous victims – people and businesses who entered into LIBOR-tied swaps with

manipulating panel banks.  One of those victims is Morgan Stanley – currently represented by

Paul Hastings for matters not related to the LIBOR investigations and, until 2015, represented by

Mr. Breen and Paul Hastings for matters related to the LIBOR investigations.

Morgan Stanley was first interviewed as a victim of LIBOR manipulation in 2013 by the

DOJ/FBI team assigned to the Barclays LIBOR investigation.  The interviewee, M.B., was

Managing Director and Global Head of U.S. Dollar Swaps at Morgan Stanley in the 2005 to

2008 time period.  Also present at the interview was Mr. Breen of Paul Hastings on behalf of

Morgan Stanley.  Although the 2013 interview was part of an investigation into a LIBOR

manipulation scheme at Barclays, not Deutsche Bank, M.B. explained specific terms used in

trade confirmation documents and also made more general statements relevant to the

government's prosecution of Mr. Connolly.  For example, according to the FBI's FD-302

summarizing that interview, M.B. said that his role was to manage and hedge Morgan Stanley's

exposure to U.S. Dollar (USD) interest rates by running a matched book, *i.e.*, a hedged book

designed to minimize exposure to movements in interest rates, having trades tied almost

exclusively to the 3-month USD LIBOR.  However, because it was not possible to be fully risk

neutral, he maintained Morgan Stanley's risk within established limits that ranged from $500,000

to $1,000,000 per basis point.[1]  As such, it was important to have a working understanding of

LIBOR and the ability to forecast LIBOR.  But until the LIBOR investigations became public,

M.B. did not suspect that panel banks manipulated LIBOR rates to benefit their trading positions.

Nevertheless, he perceived a significant profit motive for traders with interest rate exposure to

cheat by manipulating LIBOR, analogizing manipulating traders to a "swap desk on steroids"

---

[1] In other words, if 3-month USD LIBOR moved by 0.01%, Morgan Stanley's loss was less than $500,000-$1,000,000.

and saying he would not have traded with a bank if he learned that its traders were manipulating LIBOR.

The government again interviewed M.B. on May 16, 2017, but this time in the context of Morgan Stanley being victimized by LIBOR manipulation at Deutsche Bank.[2]  According to the FD-302 summarizing that interview, M.B. not only reiterated many of the same points from his 2013 interview, but also he discussed three specific USD LIBOR-based interest rate swaps that Morgan Stanley entered into with Deutsche Bank during the term of his employment.  All three swaps – which were a mixture of swaps tied to 1-month and 3-month USD LIBOR – had reset dates that are at issue in the government's LIBOR manipulation case against Mr. Connolly. Although M.B. never read the ISDA Master Agreement referenced on trade confirmations, he explained the mechanisms and timing of payment calculations for the swaps.  For one of the swaps, as an example, Deutsche Bank was required to pay Morgan Stanley an amount proportional to the 1-month LIBOR on May 15, 2008.  Accordingly, M.B. explained that if Deutsche Bank had been able to suppress the 1-month LIBOR on May 15, Morgan Stanley would have been harmed, *i.e.*, Morgan Stanley would have received less money than it otherwise would have.  Indeed, on May 15, Mr. Connolly's co-defendant, Gavin Black, requested a low 1-month submission and, in fact, Deutsche Bank's submission went from 2.49 on May 14 to 2.48

---

[2] Demonstrating that Morgan Stanley was victimized by the defendants' manipulation scheme at Deutsche Bank is straightforward.  On September 22, 2005, for example, Morgan Stanley entered into a forward rate agreement ("FRA") with Deutsche Bank.  The FRA required Morgan Stanley to pay Deutsche bank an amount proportional to the 3-month LIBOR on November 24, 2005.  On November 23, 2005, Mr. Connolly asked Deutsche Bank's primary U.S. Dollar LIBOR submitter – James King – to make a high 3-month submission the following day.  On November 24, Mr. King made Deutsche Bank's 3-month LIBOR submission at 3.40, an increase of one basis point over the previous day's submission.  An increase in LIBOR would have caused counterparties, such as Morgan Stanley, to pay more money than they otherwise would have.

on May 15.  M.B. thus effectively confirmed that Morgan Stanley is a victim of the defendants'

fraudulent scheme to manipulate LIBOR.[3]

As early as February 1, 2017, the government – believing Morgan Stanley to be a former

client of Paul Hastings – alerted Mr. Connolly's counsel that there may be conflicts of interest.

After a few ensuing conversations, the government provided Mr. Breen with the specific trade

confirmations for the relevant trades between Morgan Stanley and Deutsche Bank, and informed

Mr. Breen and Paul Hastings via email on April 19, 2017, that the conflict issue must be raised

with the Court.  In response to the government's April 19 email, Mr. Breen said that filing a

motion for a *Curcio* hearing was premature because he needed details on the Morgan Stanley

trades in order to advise his client on the waiver issue and requested any additional information

the government could provide regarding those trades to expedite the process.  He added that he

would be able to obtain a waiver from Mr. Connolly in the end, if necessary.

The government provided the requested information promptly.  On April 26, 2017, the

government produced two recently acquired Morgan Stanley-Deutsche Bank trade confirmations

that would be subjects of M.B.'s interview on May 16.[4]  On May 19, the government sent

Mr. Breen and Paul Hastings the FD-302 summarizing the interview.  The government also

informed Mr. Breen and Paul Hastings on May 19 that M.B. might testify as part of the

government's case-in-chief, and reiterated the need to contact the Court.  Although the May 19

---

[3] The FD-302s of M.B.'s 2013 and 2017 interviews are available upon request for the
Court's inspection.  The FD-302 from the 2013 interview was produced to Mr. Connolly on
November 8, 2016.  The FD-302 from the 2017 interview was produced to Mr. Connolly on May
19, 2017.  The trade confirmations discussed in each interview have been produced to
Mr. Connolly as well.

[4] The recently acquired trade confirmations (DBGJ 00055112 and DBGJ 00055120) were
produced to the government by Deutsche Bank on March 10, 2017.  A third trade confirmation
(DBGJ 00018715) that became a subject of M.B.'s 2017 interview was produced to Mr. Breen
and Paul Hastings on September 23, 2016.

communication prompted an effort to craft a joint submission, the parties were unable to reach

agreement on whether there is a conflict ripe for the Court's consideration.

In anticipation of questions the Court would likely pose at a *Curcio* hearing, the

government then contacted Morgan Stanley, which the government believed at the time to be a

former client, to ask if it has any objection to Mr. Breen and Paul Hastings representing of

Mr. Connolly in this matter.  Morgan Stanley said it would consent to the representation subject

to several conditions summarized in a June 14, 2017, letter to Mr. Breen and Paul Hastings.

Morgan Stanley voluntarily produced that letter to the government.

According to the letter, which refers to Paul Hastings as "the Firm," Morgan Stanley

consents to the representation subject to the following conditions:

- "[T]he Firm's attorneys will not be involved in the examination or cross-examination of any current or former Morgan Stanley personnel who may be called to participate in the *Connolly* proceedings or respond to a claim to restitution by Morgan Stanley."
- "[I]n representing Connolly, the Firm's attorneys will not use any confidential information obtained in the course of their representation of [Morgan Stanley]."
- "[T]he consent extends only to the Firm's representation of Connolly in connection with the Firm's defense in *United States v. Connolly, et al.*," and "does not extend to the representation by the Firm of Connolly in any other litigation, arbitration or other adversarial proceeding or claim that might arise between Morgan Stanley and Connolly in connection with the charges the government has filed against him, or otherwise."
- Paul Hastings must also receive "a written consent from Connolly to the Firm's present representation of Morgan Stanley in connection with any and all matters in which the Firm currently represents [Morgan Stanley] or its subsidiaries or affiliates."

(Ex. 1 at 1-2.)  The fourth condition – which uses the terms "present representation" and

"currently represents" – led the government to ask Morgan Stanley if, contrary to the

government's understanding, it has an ongoing attorney-client relationship with Paul Hastings.

Morgan Stanley confirmed that there is in fact an ongoing attorney-client relationship with Paul

Hastings, albeit in matters unrelated to the government's LIBOR investigations.  Paul Hastings

thus represents the perpetrator in this matter and one of his victims.[5]

### LEGAL FRAMEWORK

"The Sixth Amendment to the Constitution guarantees that 'in all criminal prosecutions,

the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'"  *Wheat*

*v. United States*, 486 U.S. 153, 158 (1988) (citing U.S. CONST. amend. VI).  As this Court

explained in *United States v. Binday*:

> A defendant has two separate Sixth Amendment rights: to representation by
> counsel of his choice (as long as he is paying the freight) and to representation by
> conflict free counsel.  While in many circumstances informed defendants are free
> to waive his lawyer's conflict of interest, the right to conflict-free representation
> trumps the right to counsel of one's choice where a court determines that the
> conflict or potential for conflict is so severe as to be unwaivable.

No. 12-cr-152 (CM), 2013 WL 1104258, at *2 (S.D.N.Y. Mar. 14, 2013) (citing *Wheat*, 486 U.S.

at 162).  Thus, "whenever there is the possibility that a criminal defendant's attorney suffers

from any sort of conflict of interest," the Court must discharge two obligations: (1) inquiry, and

(2) disqualification/waiver.  *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994).

At the inquiry stage, the Court is to "investigate the facts and details of the attorney's

interests to determine whether the attorney in fact suffers from an actual conflict, a potential

conflict, or no genuine conflict at all."  *Id.*  If the Court determines that there is an actual or

potential conflict, the Court must then proceed to the disqualification/waiver stage and inquire

into the severity of the conflict.  But because "[f]ederal courts have an independent interest in

ensuring that criminal trials are conducted within the ethical standards of the profession and that

legal proceedings appear fair to all who observe them," the Court's analysis should account for

---

[5] The government notes that Paul Hastings is a very large law firm and, given the sheer
volume of Deutsche Bank's counterparties, may have other victims among its many clients.

"[n]ot only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases [that] may be jeopardized by [the conflict]." *Wheat*, 486 U.S. at 160. *See also Binday*, No. 12-cr-152 (CM), 2013 WL 1104258, at *2 ("In balancing the defendant's Sixth Amendment interests, a trial court has an independent duty to ensure that a criminal defendant receives a fair trial, represented by an effective advocate."). As such, even a knowing and intelligent waiver by the defendant does not require the Court to allow the conflict to persist. *Wheat*, 486 U.S. at 160.

If the Court is satisfied, however, that institutional interests are not jeopardized by the conflict, then the Court should assess the severity of the conflict's capacity to undermine effective representation. *United States v. Turner*, 594 F.3d 946, 952 (7th Cir. 2010). If the conflict is "such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation – the court is obliged to disqualify the attorney." *Levy*, 25 F.3d at 153. Otherwise, "the court should follow the procedures set out in *Curcio*, 680 F.2d at 888-90, in order to obtain directly from the defendant a valid waiver of his right to a non-conflicted lawyer." *Levy*, 25 F.3d at 153.

Under *Curcio*, "[t]he first task of the trial court is to alert the defendant[] to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit." 680 F.3d at 888. In so doing, "the court should advise the defendant of his right to separate and conflict-free representation, instruct the defendant as to problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision." *Id.* at 890.

If, after all that, the defendant nevertheless wishes to waive his right to conflict-free

representation, the Court must then determine whether his waiver is "knowing and intelligent."

*Id.* at 888.  That is, the Court needs to satisfy itself – preferably through questions designed to

elicit narrative responses rather than yes/no responses – that the defendant "is aware of and

understands the various risks and pitfalls," "has the rational capacity to make a decision on the

basis of th[e] information," and has stated "clearly and unequivocally . . . that he nevertheless

chooses to hazard those dangers."  *Id.* at 888-89 (internal citation omitted).

## DISCUSSION

*A.     Actual and Potential Conflicts of Interest*

The inquiry stage of the analysis reveals that Mr. Breen and Paul Hastings have both

actual and potential conflicts.  Each is described below.

1.      Actual Conflicts

An actual conflict of interest arises when "the attorney's and defendant's interests diverge

with respect to a material factual or legal issue or to a course of action."  *Winkler v. Keane*, 7

F.3d 304, 307 (2d Cir. 1993) (internal quotation marks omitted).  One well established way in

which an attorney's interests diverge from a defendant's interests – thus creating an actual

conflict – is where the attorney's representation of the defendant impairs the attorney's ability to

adhere to the rules of professional conduct.  *Wheat*, 486 U.S. at 162.  *See also Turner*, 594 F.3d

at 952 (explaining that "[a] conflict that amounts to a breach of the code of professional ethics

obviously qualifies" as "an actual conflict of interest that seriously undermines counsel's

effectiveness").

The New York Rules of Professional Conduct, which apply to Mr. Breen and Paul

Hastings, generally prohibit an attorney from representing "differing interests" of current clients.

N.Y. RULES OF PROF'L CONDUCT r 1.7(a) (codified at 22 N.Y.C.R.R. § 1200.0).  The Rule 1.7(a)

prohibition applies to all concurrent representations unless: "(1) the lawyer reasonably believes

that the lawyer will be able to provide competent and diligent representation to each affected

client; (2) the representation is not prohibited by law; (3) the representation does not involve the

assertion of a claim by one client against another client represented by the lawyer in the same

litigation or other proceeding before a tribunal; and (4) each affected client gives informed

consent, confirmed in writing."[6]  N.Y. RULES OF PROF'L CONDUCT r 1.7(b).  The New York

Rules also prohibit an attorney from "us[ing] information relating to representation of a client to

the disadvantage of the client unless the client gives informed consent . . . ."  N.Y. RULES OF

PROF'L CONDUCT r 1.8(b).

In this case, Paul Hastings' representation of Mr. Connolly concurrently with its

representation of Morgan Stanley – the latter representation being imputed to Mr. Breen and his

defense team, N.Y. RULES OF PROF'L CONDUCT r 1.10(a) – may impair their ability to conform to

Rules 1.7(a) and 1.8(b) and thus create actual conflicts.  Beginning with Rule 1.7(a), the term

"differing interests" is not limited to clients who are on opposite sides of the "*v.*" but includes

"every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client,

whether it be a conflicting, inconsistent, diverse, or other interest."  N.Y. RULES OF PROF'L

CONDUCT r 1.0(f).  Crime victims, as the Second Circuit and other courts recognize, "possess

legitimate interests in criminal proceedings." *Prevezon*, 839 F.3d at 240.  For example, as the

consent letter states, Morgan Stanley may have a right to restitution or an independent cause of

---

[6] "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives."  N.Y. RULES OF PROF'L CONDUCT r 1.0(j).

action against Mr. Connolly.  (Ex. 1 at 1-2.)  At the same time, Mr. Connolly has an obvious

interest in minimizing any harm caused by the manipulation scheme.  Those interests are plainly

"conflicting, inconsistent, [or] diverse."  N.Y. RULES OF PROF'L CONDUCT r 1.0(f).  *See United*

*States v. Alex*, 788 F. Supp. 359, 362 (N.D. Ill. Apr. 3, 1992) (case cited with approval by

*Prevezon*, 839 F.3d at 242) (explaining that the interests of victims and perpetrators "are

diametrically opposed and may not be reconciled").

Having established that Morgan Stanley and Mr. Connolly have opposing interests, it

requires no great logical leap to conclude that use of Morgan Stanley's confidential information

in these proceedings falls within the proscription of Rule 1.8(b).  Mr. Breen and Paul Hastings

likely had access to confidential Morgan Stanley information – such as information on hedging

strategies – that Mr. Connolly might attempt to use in support of arguments on restitution or

intended loss, even if that information is not disclosed to anyone outside the firm.  *See Prevezon*,

839 F.3d at 238 (explaining in the victim-perpetrator context that "the concern is not simply the

disclosure of confidential information but the use of that information in shaping trial strategy and

questioning").  The interest of mounting a vigorous defense using all information at Mr. Breen's

and Paul Hasting's disposal, and the interest of not running afoul of Rule 1.8(b), are plainly

divergent.  Accordingly, the concurrent representations of Morgan Stanley and Mr. Connolly

create actual conflicts.  *See Prevezon*, 839 F.3d at 242 ("[C]ourts will disqualify lawyers who

switch sides from representing a crime victim to representing the perpetrator.").[7]

---

[7] Even if Morgan Stanley is not considered a current client because the representation relates only to non-LIBOR matters – a conclusion not supported by the rules of professional conduct – Mr. Breen and Paul Hastings nevertheless owe Morgan Stanley continuing duties of loyalty and confidentiality under Rule 1.9 that may interfere with their representation of Mr. Connolly in a similar way as Rules 1.7 and 1.8.  *See* N.Y. RULES OF PROF'L CONDUCT r 1.9.

2.      Potential Conflicts

A potential conflict of interest "exists if the interests of the defendant may place the
attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d
150, 153 n.3 (2d Cir. 1998).  Potential conflicts can arise where a defendant's attorney represents
a prospective witness against the defendant, and later mature into actual conflicts when the
client-witness is subject to cross examination.  *See United States v. Leslie*, 103 F.3d 1093, 1098-
99 (2d Cir. 1997).  If a substantial relationship exists between the representations, the
defendant's lawyer labors under inconsistent duties because the defendant is entitled to "a
thorough, no-holds-barred cross examination" of all government witnesses by his lawyer, who
may not be able to do so without breaching his duty to maintain his client-witness's confidences.
*United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995).  "A substantial relationship exists
where facts pertinent to the problems underlying the prior representation are relevant to the
subsequent representation." *Prevezon*, 839 F.3d at 239 (internal quotation marks omitted).
Thus, for example, a substantial relationship exists where the defense's trial strategy "turns on"
proving or disproving facts that were the subject of the other representation.  *Id.* at 240 (finding a
substantial relationship where the defendant's "trial strategy turns on proving [a former client] is
not the victim . . ., but the perpetrator").

In this case, a trial strategy of Mr. Connolly and his co-defendant, Gavin Black, is likely
to turn on their ability to prove or disprove several facts that were the subject of M.B.'s 2013
interview, at which Mr. Breen and Paul Hastings represented Morgan Stanley.  The following are
a few examples:[8]

---

[8] These examples are intended to demonstrate the conflict through foreseeable lines of
defense.  However, by providing such examples, the government does not concede that they are
all legitimate defenses and reserves the right to object to their use.

- Mr. Connolly may try to prove, as defense counsel asserted in a joint letter to the Court, that the essential terms of a trade cannot be verified based on a trade confirmation alone, and instead required additional documents such as the ISDA Master Agreement, ISDA definitions, and any other agreements between trading parties.  Joint Letter at 8, May 14, 2017, ECF No. 86.  To that end, Mr. Breen and Paul Hastings may try to cross examine M.B. on his apparent ability to understand the essential elements of Morgan Stanley trades using nothing more than their corresponding trade confirmations.

- Mr. Connolly may try to prove, as previewed by Mr. Black's lawyer's statements at the May 3 hearing, that Deutsche Bank's counterparties "knew about the manipulation, which means they weren't defrauded," Tr. at 35:19-20, ECF No. 84, and that "[t]here was no fraud" because the counterparties were "fully aware of how LIBOR was set."  *Id.* at 38:4-5.  Mr. Breen and Paul Hastings may therefore try to cross examine M.B. on his claim that he did not suspect that panel banks manipulated LIBOR rates to benefit their trading positions.

- Mr. Connolly may challenge the "money or property" element of the wire fraud statute, as previewed by his March 29, 2017, brief on the bill of particulars motion.  *See* Def.'s Reply Mem. of Law at 1, Mar. 29, 2017, ECF No. 72 (claiming that the "Profitable Trades" are the "proof that is necessary for the Government to prove the 'money or property' element of the wire fraud charges").  It is thus foreseeable that on cross examination Mr. Breen and Paul Hastings may try to undermine M.B.'s perception of a significant profit motive for traders with interest rate exposure to manipulate LIBOR and his analogy of manipulating traders to a "swap desk on steroids."

- Along similar lines, it is also foreseeable that Mr. Connolly may attempt to show that counterparties were hedged and therefore not harmed.  Mr. Breen and Paul Hastings might then try to cross examine M.B. on risk limits and his claim that perfect hedging is not possible.

- Because, as the Court pointed out in its bill of particulars opinion, the government will need to prove materiality, it is foreseeable that Mr. Connolly may attempt to disprove that a counterparty's "investment decisions . . . would have been different if [it] had known of the fraud," Mem. Decision and Order at 12, May 24, 2017, ECF No. 89.  As a result, Mr. Breen and Paul Hastings may try to cross examine M.B. on his claim that he would not have traded with an institution whose traders were manipulating LIBOR.

- Mr. Connolly is likely to attempt to disprove intent, meaning that Mr. Breen and Paul Hastings may try to cross examine M.B.'s characterization of LIBOR manipulators as cheaters.

The above examples plainly demonstrate the existence of a substantial relationship between Mr. Breen's and Paul Hasting's representation of Morgan Stanley with respect to LIBOR matters and their current representation of Mr. Connolly.  Moreover, although the existence of a substantial relationship "removes the need for courts to make direct inquiry into whether confidential information was actually transferred," *Prevezon*, 839 F.3d at 241, the high degree of overlap between the two representations renders the conclusion obvious: Mr. Breen and Paul Hastings could not conduct "a thorough, no-holds-barred cross examination" on behalf of Mr. Connolly without betraying Morgan Stanley's confidences.  *Malpiedi*, 62 F.3d at 469. Therefore, M.B.'s status as a witness who may testify creates a potential conflict for Mr. Breen and Paul Hastings, which may ripen into an actual conflict if M.B. is in fact called to testify.

B.      *Disqualification and/or Waiver*

As stated at the outset, the record requires further development for purposes of determining whether disqualification or waiver is appropriate.  For example, the scope and magnitude of Paul Hastings representation of Morgan Stanley, the nature of any ongoing relationship between Paul Hastings and Morgan Stanley, Mr. Breen's and Paul Hastings' history as Mr. Connolly's counsel, and Mr. Connolly's understanding of the import of any waiver he provides are all relevant to the inquiry at this stage.

That being said, the government notes two important considerations.  First, a representation that conflicts with the rules of professional conduct is serious because it "'invites disrespect for the integrity of the court, [and] is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.'"  *Wheat*, 486 U.S. at 162 (quoting *United States v. Dolan*, 570 F.2d 1177, 1184

14

(3d Cir. 1978)). Second, although Morgan Stanley provided consent to the representation, that consent is heavily conditioned and may, depending on further factual development, effectively amount to non-consent.

Therefore, the government respectfully requests that the Court hold a *Curcio* hearing to complete the record, to determine if the conflicts are waivable,[9] and, if so, whether any waiver defense counsel obtains from Mr. Connolly is knowing and intelligent. For the latter determination and in accordance with Second Circuit guidance, the Court should (1) advise Mr. Connolly about the actual and potential conflicts, (2) ensure that Mr. Connolly understands the risks of those conflicts, including the risk that Mr. Breen and Paul Hastings would not be permitted to cross examine M.B. or otherwise discredit his testimony in summation, *Binday*, No. 12-cr-152 (CM), 2013 WL 1104258, at *5, and (3) give Mr. Connolly time to digest and contemplate those risks with, if he so chooses, the aid of independent counsel. *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir. 1995).[10]

---

[9] After the factual record is complete, if appears that the conflicts could be unwaivable, the government may respectfully request leave of the Court to further brief the issue.

[10] If the Court so desires, the government can provide proposed questions for Mr. Connolly.

## CONCLUSION

For the reasons stated, the Court should grant the government's motion and schedule a

*Curcio* hearing at the Court's earliest convenience.  A proposed order is attached.


SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
United States Department of Justice


_____/s/_____
CAROL L. SIPPERLY
Assistant Chief
ALISON L. ANDERSON
RICHARD A. POWERS
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

_____/s/_____
MICHAEL T. KOENIG
Trial Attorney
Antitrust Division
United States Department of Justice
(202) 616-2165