**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

*Defendants.*

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
# JOINT MOTION TO COMPEL DISCOVERY AND FOR A *KASTIGAR* HEARING

**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090

*Attorneys for Defendant Matthew Connolly*

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

LEGAL STANDARD .............................................................................................................. 7

ARGUMENT .......................................................................................................................... 8

    I.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE
        IN ITS POSSESSION DEMONSTRATING THAT THE BBA KNEW OF
        THE CONDUCT UNDERLYING THE CHARGES IN THIS CASE ...................... 8

        A.  Defendants Have Obtained Evidence Showing that the BBA Knew
            Contributor Panel Banks Took into Account Derivatives Positions in
            Making Their LIBOR Submissions ................................................................. 9

        B.  Defendants Believe that the Government Possesses Evidence that It
            Has Not Produced Concerning the BBA's Knowledge that Contributor
            Panel Banks Took into Account Derivatives in Their LIBOR
            Submissions ................................................................................................. 11

    II.  THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE
        THAT THE ALLEGED VICTIMS ENGAGED IN THE SAME CONDUCT
        AS THAT UNDERLYING THE CHARGES IN THIS CASE ................................ 12

    III. THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE
        THAT THE BANK OF ENGLAND KNEW OF THE CONDUCT
        UNDERLYING THE CHARGES IN THIS CASE AND ENGAGED IN
        SIMILAR CONDUCT ..................................................................................... 14

    IV. A *KASTIGAR* HEARING IS NECESSARY ............................................................ 16

CONCLUSION ..................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
  373 U.S. 83 (1963) ............................................................................................ *passim*

*Hughes v. Phillips,*
  457 F. Supp. 2d 343 (S.D.N.Y. 2006) .................................................................. 7

*Kastigar v. United States,*
  406 U.S. 441 (1972) .................................................................................. 1, 4, 17

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ............................................................................................ 7

*United States v. Allen,*
  160 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................................................ 3, 13

*United States v. Allen,*
  Nos. 16-898-cr, 16-939-cr (2d Cir. July 19, 2017) ............................................ 1

*United States v. Binday,*
  908 F. Supp. 2d 485 (S.D.N.Y. 2012) .................................................................. 7

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001) ................................................................................ 7

*United States v. D'Amico,*
  734 F. Supp. 2d 321 (S.D.N.Y. 2010) .................................................................. 7

*United States v. Douglas,*
  415 F. Supp. 2d 329 (S.D.N.Y. 2006) .................................................................. 7

*United States v. Ghailani,*
  687 F. Supp. 2d 365 (S.D.N.Y. 2010) .................................................................. 8

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
  822 F.3d 650 (2d Cir. 2016) ................................................................................ 8

*United States v. Pirro,*
  212 F.3d 86 (2d Cir. 2000) .............................................................................. 14

*United States v. Triumph Capital Grp., Inc.,*
  544 F.3d 149 (2d Cir. 2008) .............................................................................. 12

*United States v. Urena,*
  989 F. Supp. 2d 253 (S.D.N.Y. 2013). ................................................................ 8

## TABLE OF AUTHORITIES

**Page(s)**

**Rules**

Federal Rule of Criminal Procedure 16 ...................................................................... 1, 8

**Other Authorities**

U.S. Dep't of Justice, U.S. Attorneys' Manual ......................................................... 7, 9

Defendants Matthew Connolly and Gavin Campbell Black ("Defendants") respectfully submit this memorandum of law in support of their motion to compel discovery from the United States Department of Justice (the "Government") pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*") and Federal Rule of Criminal Procedure ("Rule") 16 and for a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972) ("*Kastigar*"). [1]

## PRELIMINARY STATEMENT

The Government has failed to produce material and exculpatory evidence that refutes the existence of the alleged scheme to defraud in violation of the criminal discovery rules and its constitutional obligations under *Brady*. Because many of these materials relate to persons and entities located outside of the jurisdiction of this Court, the Government should be compelled to produce these materials now to allow for their effective use at trial.

The Superseding Indictment (the "Indictment" or "SI") alleges that Defendants caused Deutsche Bank AG ("Deutsche Bank") to make false and fraudulent London Inter-Bank Offered Rate ("LIBOR") submissions to the British Bankers Association ("BBA")—the private trade association with sole responsibility for defining the parameters of appropriate LIBOR submissions during the relevant period. For each relevant currency, the BBA calculated LIBOR—a benchmark interest rate used in the pricing of derivatives instruments such as fixed-income futures and swaps—based on the daily submissions of a panel of banks (the "Contributor

---

[1] On the day Defendants' motions were due in this action, the Second Circuit issued an 81-page decision in *United States v. Allen*, Nos. 16-898-cr, 16-939-cr (July 19, 2017) ("*Allen II*"), overturning the convictions of and dismissing the indictment against two LIBOR submitters, employed by Rabobank, who had been charged on a theory similar to that which the Government has alleged here. The *Allen II* decision represents the Second Circuit's first statement concerning LIBOR in a criminal matter. In light of the overlapping theories of criminality in *Allen II* and the instant case, Defendants believe the *Allen II* decision is relevant to the instant motion. Pursuant to the Court's July 19, 2017 order [ECF No. 101], Defendants will request leave to amend the instant motion at the July 25, 2017 conference.

Panel" banks) as to their hypothetical borrowing costs for that currency, i.e., the rate at which each bank "could . . . borrow funds, were [it] to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11:00 a.m. London Time."

The Indictment does not allege that Deutsche Bank's LIBOR submissions failed to accurately reflect the rates at which Deutsche Bank could borrow United States Dollars ("USDs"). Rather, the Indictment's theory of criminality is that some of Deutsche Bank's LIBOR submissions violated the BBA's LIBOR definition because they did not reflect Deutsche Bank's "best estimate of its actual borrowing costs" and took into account its "derivatives trading positions." [ECF No. 89 ("May 24 Order") at 3.] As recognized by the Court, the Government contends that the BBA "unwittingly," and to the detriment of Deutsche Bank's counterparties, incorporated the allegedly false submissions into its daily calculations of USD LIBOR submissions. (*Id.* at 4.)

Defendants believe that the Government possesses three categories of evidence that it has failed to produce in violation of its Rule 16 and *Brady* obligations.

**First**, the Government has failed to produce evidence that, starting at least as early as 2005, the BBA was aware that many Contributor Panel banks took derivatives positions into account when calculating their LIBOR submissions but took no steps to correct or eliminate this practice. For example, Defendants believe that the Government is in possession of BBA internal documents that demonstrate multiple Contributor Panel banks advised the BBA of their understanding that the LIBOR rules permitted consideration of derivatives positions in making LIBOR.

**Second**, the Government has failed to produce evidence that the alleged victims either took derivatives positions into account in making their own LIBOR submissions or were aware

that other Contributor Panel banks did so. Defendants believe that the Government is in possession of exculpatory evidence gathered in its other investigations—including, but not limited to, white papers, presentations and notes of attorney proffers—that the Government has refused to produce in response to Defendants' repeated requests. For example, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") (another USD Contributor Panel bank and an alleged victim) entered into a deferred prosecution agreement with the Government in which it admitted to engaging in the same conduct underlying the charges here. The Government then prosecuted Rabobank's LIBOR submitters on the same theory of fraud as that alleged in this case. *See generally United States v. Allen*, 160 F. Supp. 3d 698 (S.D.N.Y. 2016) ("*Allen*").

**Third**, the Government has failed to produce evidence in its possession demonstrating that the Bank of England—the United Kingdom's Central Bank—directed at least one Contributor Panel bank on multiple occasions to lower its LIBOR submissions below its projected borrowing costs to alleviate the effects of the financial crisis. Contrary to the scheme alleged, the Bank of England did not view the artificial lowering of these LIBOR submissions as an improper manipulation of LIBOR, but instead likened it to the appropriate effort of a physician to bring down the temperature of a sick patient.

Because the Government has failed to produce material and exculpatory evidence as required under Rule 16 and *Brady*, an order compelling production of such materials is warranted.

In addition, because Mr. Black was compelled to testify before the United Kingdom's Financial Conduct Authority ("FCA"), an entity that worked with the Government in

3

investigating this case, a *Kastigar* hearing is appropriate to determine whether the Government's testimony is free from the taint of Mr. Black's compelled testimony.

## BACKGROUND

### A. The BBA's LIBOR Definition

During the relevant period, the BBA had *sole* responsibility for defining the parameters of appropriate LIBOR submissions by the Contributor Panel banks, and it administered this responsibility without any government oversight.  (*See, e.g.*, Declaration of Seth L. Levine ("Levine Decl.") Ex. A at 107 ("[T]he LIBOR definition was devised by the BBA, not a government agency, and the government never claimed otherwise."); *id.* Ex. B at Statement of Facts ("SOF") ¶ 2.)  In fact, the Financial Services Authority (the "FSA"), the United Kingdom's financial enforcement agency, concluded that oversight of LIBOR was not within its purview because "contributing to or administering LIBOR" were not among the activities regulated by the FSA.  (*Id.* Ex. C ¶ 152; *see also id.* Ex. D at c. 8, § 22 & sched. 2 (LIBOR contributions not included among banks' "regulated activities").)

The BBA calculated USD LIBOR during the entirety of the period covered by the Indictment by asking 16 Contributor Panel banks to answer the following question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11:00 a.m. London Time."  (*See id*. Ex. A at 5; Ex. B at SOF ¶ 2.)  The Contributor Panel banks were required to make their submissions to Thomson Reuters, acting as an agent for the BBA, at or before 11:10 a.m. London Time.  (SI ¶ 2.)  The Contributor Panel banks' submissions for USD LIBOR consisted of a single number that was between two and five decimal places for each borrowing period, or "tenor."  (*Id.*)  To determine USD LIBOR as to each tenor, Thomson Reuters:  (a) ranked the submissions from

highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions. (*Id.*) Thomson Reuters then published the daily LIBORs by 12:00 p.m. London Time each day. (*Id.* ¶ 3.)

### B. The Charged Scheme

The Indictment charges Defendants with one count of conspiracy to commit wire fraud and bank fraud, pursuant to 18 U.S.C. § 1349, and ten counts of wire fraud, pursuant to 18 U.S.C. §§ 1343 and 2. The Indictment premises each of these charges on the allegation that Defendants and others engaged in a scheme to cause Deutsche Bank's USD LIBOR submissions to be "false" and "fraudulent" in that they were "designed to benefit trad[ing] positions." (SI ¶ 27(a); *see also id.* ¶¶ 8, 26.) As the Court explained: "The gravamen of the charges against the defendants is that they participated in a seven year long scheme to manipulate the data that Deutsche Bank sent to the BBA, so that the submissions did not reflect Deutsche Bank's best estimate of its actual borrowing cost for that currency and tenor, but rather took into account the derivatives trading positions of defendants and their confederates." (May 24 Order at 3.) Neither Defendant was responsible for making Deutsche Bank's USD LIBOR submissions. (*See* SI ¶¶ 12-13.) Rather, the Indictment alleges that Defendants either traded, or supervised other Deutsche Bank employees who traded, derivative products that referenced USD LIBOR. (*Id.* ¶¶ 10-11.)

As noted above, the BBA defined LIBOR as "[t]he rate at which an individual Contributor Panel bank ***could*** borrow funds . . . ." (Levine Decl. Ex. B at SOF ¶ 2 (emphasis added).) The Indictment, however, does not allege that Deutsche Bank could not borrow funds at the submitted rates, or that Defendants or Deutsche Bank's LIBOR submitters knew or believed that Deutsche Bank could not borrow funds at the submitted rates. (*See* SI ¶¶ 25, 26,

27(a).)  Rather, the Indictment claims that some of Deutsche Bank's USD LIBOR submissions were false only in that they did not reflect "an unbiased estimate of the rate at which Deutsche Bank could borrow unsecured funds" because they were designed to benefit Deutsche Banks' trading positions.  (*Id.* ¶ 27(a).)

"The purported victims of this scheme were the contra-parties to trades that were allegedly impacted as a result of Deutsche Bank's doctored, and hence fraudulent, contribution to the LIBOR rate setting process."  (May 24 Order at 4.)  The Indictment does not, however, allege that any of the supposed false statements were made to any of Deutsche Bank's counterparties.  (*See* SI ¶¶ 25, 26, 27(a).)  Rather, as described by the Court, the Government's theory is that Defendants caused false statements to be made ***to the BBA***, which "***unwittingly*** utilized those false statements to set various LIBOR benchmark rates in ways that allegedly favored Deutsche Bank's position in various derivatives trades, thereby causing losses to various third parties."  (May 24 Order at 4 (emphasis added).)  Indeed, many of the counterparties identified by the Government have admitted in settlements with the Government and other regulatory entities to have engaged in the same conduct underlying the charges in this case.  (*See, e.g.*, Levine Decl. Exs. E-I.)

## C. The Relief Requested

Defendants seek an order compelling the Government to produce materials that demonstrate:

1. the BBA was aware or notified of the practice by Contributor Panel banks of taking into account, incorporating, using and/or considering derivatives when making their LIBOR submissions and that such submissions did not reflect a Contributor Panel bank's "best estimate of its actual borrowing costs";

2. Deutsche Bank counterparties did not abide by the alleged "best estimate" requirement and/or took into account derivatives in making their LIBOR submissions, or were aware that Contributor Panel banks did so, including, but not limited to, white papers, presentations, and notes of attorney proffers during

6

which attorneys for the Government's cooperators, alleged coconspirators, and other potential witnesses previewed exculpatory evidence that their clients would provide; and

3. efforts by the Bank of England to influence a Contributor Panel bank's LIBOR submission, including, but not limited to, testimony and other materials obtained by the Government in connection with *In re Project Bruce*.

## LEGAL STANDARD

Under *Brady*, the Government has a due process obligation to disclose evidence that is "favorable to the accused" and "material to either guilt or punishment." *United States v. Douglas*, 415 F. Supp. 2d 329, 336 (S.D.N.Y. 2006). Among other things, this obligation imposes on each individual prosecutor the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." [ECF No. 61 ("Mar. 2 Order") at 8.] Evidence is considered "'favorable' if it exculpates the defendant or if it could have been used to impeach other evidence relied on by the Government." *Hughes v. Phillips*, 457 F. Supp. 2d 343, 359 (S.D.N.Y. 2006) (citing *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)).

The Government has a pre-trial obligation "to disclose *Brady* material in sufficient time for the defense to make effective use of it at trial." *United States v. D'Amico*, 734 F. Supp. 2d 321, 367 (S.D.N.Y. 2010). This Court has stated that "'timeliness' with respect to *Brady* disclosure means immediate disclosure upon discovery." *United States v. Binday*, 908 F. Supp. 2d 485, 498 (S.D.N.Y. 2012). Additionally, the United States Attorneys' Manual directs prosecutors to dispense with any materiality requirement in making pre-trial *Brady* disclosure decisions and to "err on the side of disclosing exculpatory and impeaching evidence." U.S. Dep't of Justice, U.S. Attorneys' Manual 9-5.001, 2006 WL 4803861, at *1 (Oct. 2006) (citing *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)).

Pursuant to Rule 16(a)(1)(E)(i), the Government must disclose, upon request, items in the Government's possession that are "material to preparing the defense."  Rule 16 imparts broader pre-trial demands on the Government than does *Brady.  See, e.g.*, *United States v. Ghailani*, 687 F. Supp. 2d 365, 371 n.25 (S.D.N.Y. 2010) ("Whereas *Brady* is grounded in due process rights and seeks to ensure fair trials by preventing the suppression of exculpatory evidence, Rule 16 is a general criminal discovery mandate approved by Congress in the interests of promoting broader pre-trial discovery for both defendants and the government.").  The "materiality standard of Rule 16 normally is not a heavy burden" and asks only whether the evidence "could be used to counter the government's case or to bolster a defense."  *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013).

## ARGUMENT

**I.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE IN ITS POSSESSION DEMONSTRATING THAT THE BBA KNEW OF THE CONDUCT UNDERLYING THE CHARGES IN THIS CASE**

The Government's theory of prosecution is that Defendants deceived the BBA, which "unwittingly" utilized Deutsche Bank's allegedly false LIBOR submissions in its setting of LIBOR.  (May 24 Order at 4; *cf. United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) ("[A]t its core, fraud requires proof of deception.").)  Defendants asked the Government to disclose whether it possesses any BBA-related materials that it received directly either from the BBA or indirectly through another regulator and, if so, whether the Government produced such materials.  (Levine Decl. Ex. J at 2-3.)  The Government did not directly respond to this request, stating only, without elaboration, that it is "aware of, complying with, and will continue to comply with, [its] discovery obligations."  (*Id.* Ex. K at 2.)

Defendants believe that the Government has failed to produce exculpatory evidence in its possession that shows the BBA knew, as early as 2005, that Contributor Panel banks took

derivatives positions into account in making their LIBOR submissions but took no action to correct this practice. While Defendants have obtained some of these exculpatory materials, they do not have access to any such materials created after 2007. The Government should be compelled to produce all materials evidencing this knowledge pursuant to Rule 16 and *Brady*.[2]

**A. Defendants Have Obtained Evidence Showing that the BBA Knew Contributor Panel Banks Took into Account Derivatives Positions in Making Their LIBOR Submissions**

Defendants have obtained evidence showing that the BBA knew that Contributor Panel banks took into account derivatives positions in making their LIBOR submissions. During the recent Serious Fraud Office ("SFO") re-trial of two former Barclays Bank PLC ("Barclays") traders (the "Barclays Trial"), various internal BBA documents were introduced, including: (i) notes pertaining to the BBA's annual meetings with Contributor Panel banks from 2005 through 2007, (ii) summaries of statements that some of the Contributor Panel banks and other market participants made to the BBA between 2005 and 2007, and (iii) a memorandum setting forth the BBA's statements to the Bank of England in August 2006 (collectively, the "BBA Documents"). (*See* Levine Decl. Ex. L.) The BBA Documents reflect that, since at least 2005, the BBA was aware that Contributor Panel banks considered derivatives positions in calculating their LIBOR submissions and that the Government's alleged "best estimate of borrowing costs" requirement was not contemplated by either the BBA or Contributor Panel banks. For example, the BBA Documents include the following statements attributed to Contributor Panel banks, including Deutsche Bank:

---

[2]   Because any evidence of the BBA's knowledge would "directly negate[] the guilt" of Defendants for the charged scheme, Defendants believe the Government "must" have also "present[ed] or otherwise disclose[d] such evidence to the grand jury." U.S. Dep't of Justice, U.S. Attorneys' Manual 9-11.233, 2000 WL 1708130, at *1 (June 2008).

- ***Deutsche Bank*** explained that it "create[s] [its] BBA LIBOR rates *referencing the derivatives market* as cash isn't liquid or transparent enough." (*Id*. at 26 (emphasis added).)

- ***HBOS***:  "BBA LIBOR fixing process works well.  As the market standard. BBA LIBOR is well understood.  *Some companies will quote rates to suit their current position.  It has always been the way.*  BBA LIBOR is just fine as it is." (*Id*. at 11 (emphasis added).)

- ***JP Morgan Chase***:  "Notes that GBP and *US dollar LIBOR are higher than the true position, but everyone in the market knows this, and prices accordingly.*  Do not want the BBA to attempt to 'correct' this." (*Id*. at 10 (emphasis added).)

- ***Bank of America***:  "The rate setting process is currently efficient.  [Bank of America] is often dropped from the USD fixings at [1 month] and [3 month] but this is because *they generate their LIBOR rates off the derivatives market*." (*Id*. at 25 (emphasis added).)

- ***Bank of Tokyo-Mitsubishi***:  "[S]ometimes BBA LIBOR quotes are high because they are set by the treasury function within a bank that then goes on to use the BBA LIBOR rate internally in the bank.  In these cases the treasury dept. can *make extra profit by charging other departments in the bank itself at that artificial rate*." (*Id*. at 11 (emphasis added).)

The BBA Documents also contain a "summary" of these statements "ahead of the 2005 panel review." (*Id*. at 7.)  That summary stated that there was a "consensus amongst banks that Sterling LIBOR and US Dollar are being set 3 - 4 basis points above the true cash rate." (*Id.*)  The summary also explained that "[t]hose banks whose main business is in derivatives or loans are perfectly happy with this, as it is to their advantage." (*Id.*)

The BBA also created a memorandum, dated August 18, 2005, documenting its statements to the Bank of England relating to these issues. (*See id.* at 17-21.)  This memorandum reflects that John Ewan, the former Managing Director of the BBA, advised the Bank of England:

> [T]here was a market consensus that the GBP-USD LIBOR was some 3-4 [basis points] over the actual market rate.  ***This was essentially a construct of the market, as it is in the interests of banks to have higher LIBOR***.

(*Id.* at 20 (emphasis added).)   Despite the BBA's knowledge that Contributor Panel banks believed that the BBA LIBOR rules permitted them to take into account derivatives in making their submissions, Defendants are not aware of any action that the BBA took during the time period covered by the Indictment to correct this view or to enforce a "best estimate of borrowing cost" requirement as the Government alleges.

### B. Defendants Believe that the Government Possesses Evidence that It Has Not Produced Concerning the BBA's Knowledge that Contributor Panel Banks Took into Account Derivatives in Their LIBOR Submissions

Defendants believe that the Government possesses the exculpatory evidence referenced above, as well as additional evidence showing that the BBA knew that Contributor Panel banks took into account derivatives in their LIBOR submissions, for several reasons.   First, the Government is in possession of Ewan's prior testimony from another criminal trial in the United Kingdom in which the BBA Documents are referenced, and submitted that testimony to the Second Circuit in connection with the *Allen* appeal.   (*See* Levine Decl. Ex. M.)   Second, Defendants understand that the BBA produced materials to at least the Federal Bureau of Investigation in the course of its investigation.   Third, given that the BBA's knowledge (or lack thereof) is central to the Government's theory of prosecution, it is unfathomable that the Government did not seek or obtain evidence regarding the BBA's knowledge prior to asking a grand jury to return an indictment against Defendants.[3]

While Defendants were able to obtain the BBA Documents entered into evidence at the Barclays Trial, the relevant conduct alleged in that trial concluded in 2007.   Therefore, Defendants do not have access to any BBA materials after 2007, including, but not limited to, the BBA's notes of annual Contributor Panel bank reviews, its communications with the Bank of

---

[3]   The Government is obliged to make a "good-faith effort" to obtain such materials.   (Mar. 2 Order at 17.)

England, and other LIBOR-related communications.  Based on testimony from the SFO trials and *Allen*, Defendants believe that additional exculpatory materials exist for the post-2007 time period.  Given the Government's failure to produce the BBA Documents and its refusal to confirm that it does not possess any internal BBA documents, the Court should issue an order compelling the Government to produce any and all materials that suggest that the BBA was aware or notified of the practice by Contributor Panel banks of taking into account, incorporating, using and/or considering derivatives when making their LIBOR submissions.

## II.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE THAT THE ALLEGED VICTIMS ENGAGED IN THE SAME CONDUCT AS THAT UNDERLYING THE CHARGES IN THIS CASE

Defendants believe that the Government has failed to produce evidence in its possession that the alleged victims in this case engaged in same conduct as was charged of Defendants here, or were at least aware that this conduct was occurring.  The Government has categorically refused to turn over any white papers, presentations, or notes of attorney proffers (collectively, the "Meeting Materials"), other than those involving Deutsche Bank and Rabobank, during which attorneys for the Government's cooperators, alleged coconspirators, and other potential witnesses previewed exculpatory evidence that their clients would provide.  (Levine Decl. Ex. K at 1-2.)[4]  The Government should be required to produce these materials under *Brady* because statements made to the Government by attorneys on behalf of their clients are attributable to the clients for *Brady* purposes.  *See, e.g.*, *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 163 (2d Cir. 2008) (finding *Brady* violation where the prosecution failed to disclose handwritten notes taken by an FBI agent "at a meeting where [a cooperator's] attorney approached the

---

[4]   Notably, while the Government indicated its intention on May 12, 2017 to produce the Rabobank white paper, the Government has yet to produce that white paper in its entirety to Defendants' knowledge.  (*See* Levine Decl. Ex. K at 1.)

government on [the cooperator's] behalf to relate [the cooperator's] account of his criminal activity in an attempt to convince the government to offer him a cooperation agreement").

Moreover, Defendants have a good-faith basis to believe that the Meeting Materials contain exculpatory evidence. It appears that several of the alleged victims in this case were Contributor Panel banks—some of whom settled with the Government and/or the Commodity Futures Trading Commission ("CFTC") for engaging in the same conduct underlying the charges in this case. For example, the Government's March 2, 2017 list of counterparties allegedly affected by the scheme includes Rabobank, Barclays, Citibank N.A. ("Citibank"), UBS AG ("UBS"), and The Royal Bank of Scotland plc ("RBS"), each of which was a Contributor Panel bank. Indeed, Rabobank not only entered into settlements with the Government and the CFTC in which it admitted that it made LIBOR submissions that benefitted its traders' positions (*see id.* Exs. E & N), but the Government also prosecuted Rabobank's LIBOR submitters for allegedly engaging in this same conduct. *See Allen*, 160 F. Supp. 3d at 700-01 (stating that the defendants were charged with wire fraud and conspiracy to commit bank fraud and wire fraud based on allegations that they participated in a scheme to manipulate LIBOR "to favor the trading positions of Rabobank traders"). Further, the Government here also alleges that Mr. Black "discussed USD LIBOR submissions and manipulation with individuals at other Contributor Panel banks, including [Rabobank]." (SI ¶ 27(i).) Similarly, Barclays, Citibank, UBS, and RBS entered into settlements with the Government and/or governmental entities in which they admitted to making LIBOR submissions that took into account their derivative trading positions. (*See* Levine Decl. Exs. F-I.) In addition, to the extent that entities and potential witnesses asserted to the Government that BBA rules did not prohibit a Contributor Panel bank's consideration of derivatives in making its LIBOR submissions, these statements provide

additional evidence that the Government's proposed construction of the LIBOR definition is incorrect or, at the very least, that the BBA did not clearly prohibit the alleged conduct in this case. *See, e.g.*, *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.").

The Meeting Materials and any other documents suggesting that alleged victims, as well as any other counterparties, were engaging in the same conduct that is alleged in the Indictment, or had knowledge of such conduct, is material and exculpatory and should therefore be produced.

## III.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVIDENCE THAT THE BANK OF ENGLAND KNEW OF THE CONDUCT UNDERLYING THE CHARGES IN THIS CASE AND ENGAGED IN SIMILAR CONDUCT

Defendants believe that the Government has failed to produce materials in its possession that demonstrate the Bank of England—the United Kingdom's Central Bank—not only knew that Contributor Panel banks took into account derivatives, *supra* at 9-10, but also encouraged Contributor Panel banks' submissions to deviate from actual borrowing costs. Notwithstanding Defendants' specific request for these materials, the Government has failed to produce this material and exculpatory evidence.

Based on publicly available information, Defendants believe that the Government has materials in its possession demonstrating that the Bank of England itself used financial considerations to influence at least one Contributor Panel bank's LIBOR submissions. Based on an April 2017 documentary by the British Broadcasting Corporation ("BBC") titled "Panorama, The Big Bank Fix," Defendants understand that the Government is in possession of evidence that Paul Tucker, the former Executive Director of the Bank of England, "began pressuring Barclays" during the financial crisis to lower its LIBOR submissions below its projected cost of borrowing because a lower LIBOR rate would give the appearance that the economy was on the mend.

14

(Declaration of Jonathan Brogden ("Brogden Decl.") ¶ 3; *see also* Levine Decl. Ex. O.)   As reflected in the BBC documentary, the Government obtained confidential testimony in February 2011 from a Barclays employee, in a matter designated "*In re Project Bruce*," that Tucker directed Barclays, starting in or about September 2007, to lower its LIBOR submission in order to alleviate the effects of the financial crisis.   (*See* Brogden Decl. ¶¶ 4-6 & Ex. 1.)   Public reporting of the BBC's documentary also suggests that, on or about October 29, 2008, Tucker instructed Barclays' then-chief executive, Bob Diamond, to lower Barclays' LIBOR submissions.   (*See* Levine Decl. Ex. O at 2; *id.* Ex. P at 1-2.)   The BBC reported the existence of a recording evidencing that this Bank of England directive made its way to Barclays' LIBOR submitter:

> In the recording, a senior Barclays manager, Mark Dearlove, instructs [the] Libor submitter Peter Johnson, to lower his Libor rates.
>
> He tells him: "The bottom line is you're going to absolutely hate this . . . but we've had some very serious pressure from the UK government and the Bank of England about pushing our Libors lower."
>
> Mr[.] Johnson objects, saying that this would mean breaking the rules for setting Libor, which required him to put in rates based only on the cost of borrowing cash.
>
> Mr[.] Johnson says: "So I'll push them below a realistic level of where I think I can get money?"
>
> His boss Mr[.] Dearlove replies: "The fact of the matter is we've got the Bank of England, all sorts of people involved in the whole thing . . . I am as reluctant as you are . . . these guys have just turned around and said just do it."

(*Id.* Ex. O at 2; *see also id.* Ex. P at 1-2.)

Moreover, in testimony before Parliament, Mervyn King, who was the Governor of the Bank of England at the time of Tucker's communication with Barclays, denied that the Bank of England's instruction to Barclays to lower artificially its LIBOR submissions was improper. Rather, during that testimony, he likened the instruction to lower the LIBOR submission to an

effort by a physician to bring down the temperature of a sick patient, stating: "[LIBOR] was moving up and down a great deal, and it was like a thermometer[;] it gauges the health of the patient.  When a patient is sick you want to bring temperature down but that is not the same as tampering with a thermometer."  (*Id.* Ex. Q at 2.)

Mr. Black specifically requested that the Government produce the communications referenced above and any other materials relating to the Bank of England's LIBOR-related communications with Contributor Panel banks between 2007 and 2011.  (*See id.* Ex. J at 3.)  The Government has not produced these materials or denied that it possesses them.  The Government also did not provide a specific response to Mr. Black's request, instead responding merely that it is "aware of, complying, and will continue to comply with, [its] good faith discovery obligations."  (*Id.* Ex. K at 2.)

The Government's failure to turn over these clearly exculpatory materials demonstrates that the Government has not complied with its Rule 16 and *Brady* obligations.  Accordingly, Defendants respectfully request that the Court order the Government to produce any and all materials pertaining to LIBOR-related communications between Tucker, or any other representative of the Bank of England, and any Contributor Panel bank, including, but not limited to, testimony and other materials obtained in *In re Project Bruce*.

## IV.    A *KASTIGAR* HEARING IS NECESSARY

A *Kastigar* hearing is necessary to determine whether the Government improperly used compelled testimony given by Mr. Black before the FCA.[5]  On October 3, 2013, Mr. Black, a U.K. citizen, was compelled to testify before the FCA.

---

[5]    As referenced *supra* n.1, the Second Circuit's decision in *Allen II* bears on this issue.

Where, as here, a witness has been compelled to testify regarding matters relating to the federal prosecution, the Government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar*, 406 U.S. at 461-62. This burden requires the Government to prove that its evidence is "**wholly independent** of [any] compelled testimony." *Id.* at 460 (emphasis added).

It is not disputed that the Government and the FCA worked together in investigating of this case. For example, documents obtained by the FCA in the course of its investigation were subsequently produced to the Government. [ECF No. 51 at 10.] Similarly, the Government and FCA participated in joint interviews. As explained by the Government the "FCA investigators attended two out of the thirty-four DOJ interviews related to this case, including the interview of defendant Connolly." [*Id.* at 9.] The Government also acknowledged that it had discussions with the FCA about these interviews. [*Id.*] Further, documents produced in discovery reveal that the FCA also attended one of the interviews of a cooperating witness expected to testify at the trial in this case—James King.

Because the FCA took compelled testimony of Mr. Black and coordinated its efforts with the Government, a hearing is necessary to determine whether the Government's evidence is "**wholly independent** of [any] compelled testimony." *Kastigar*, 406 U.S. at 460. At that hearing, the Government should be required to disclose whether any individual or entity, including, but not limited to, Deutsche Bank and the cooperating witnesses in this case, reviewed, shared or had access to Mr. Black's compelled FCA testimony.

Mr. Connolly is currently considering the impact of the *Allen II* decision on these proceedings. Mr. Connolly proffered with the Department of Justice in 2013, which was

attended by FCA representatives.   Accordingly, he respectfully requests an opportunity to supplement this motion after fully analyzing the Second Circuit's decision.

## **CONCLUSION**

For these reasons, the Court should order the Government to produce the materials requested herein and confirm that it has met its constitutional and discovery obligations, and grant such further relief that it deems just and proper.

Dated: New York, New York
      July 19, 2017

                                  Respectfully Submitted:

By: S/ Kenneth M. Breen                      By: S/ Seth L. Levine
     (electronic signature with permission)              Seth L. Levine
     Kenneth M. Breen                            Miriam L. Alinikoff
     John P. Nowak                               Aaron I. Karp
     Phara A. Guberman
     Jane H. Yoon

**PAUL HASTINGS LLP**                      **LEVINE LEE LLP**
200 Park Avenue                               650 Fifth Avenue, 13th Floor
New York, New York 10166                New York, New York 10019
Telephone:  (212) 318-6000              Telephone:  (212) 223-4400
Facsimile:  (212) 319-4090              Facsimile:  (212) 223-4425
kennethbreen@paulhastings.com          slevine@levinelee.com
johnnowak@paulhastings.com            malinikoff@levinelee.com
pharaguberman@paulhastings.com       akarp@levinelee.com
janeyoon@paulhastings.com

*Attorneys for Defendant Matthew Connolly*     *Attorneys for Defendant Gavin Campbell Black*