**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

Defendants.

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**JOINT AMENDED MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Attorneys for Defendant Matthew Connolly*

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.    Oversight of LIBOR ........................................................................................... 3

    B.    The Charged Scheme ......................................................................................... 4

LEGAL STANDARD ............................................................................................................ 8

ARGUMENT ...................................................................................................................... 10

I.     THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE
     THAT DEFENDANTS' CONDUCT VIOLATED A BBA LIBOR RULE ..................... 10

II.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE STATUTES
     CHARGED, AS APPLIED TO THIS CASE, ARE IMPERMISSIBLY VAGUE ......... 12

    A.    Defendants Had No Fair Warning that the Alleged Consideration of
        Derivatives Positions Was Prohibited, Much Less Criminal ................................. 13

        1.    The BBA Definition Must Have Provided Fair Warning to Defendants
             that the Alleged Conduct Was Prohibited ................................................. 13

        2.    The BBA Definition Does Not Provide Fair Warning ............................. 16

        3.    The BBA Knew that LIBOR Submitters Considered Derivatives
             Positions But Did Not Take Any Action ................................................... 19

    B.    Because No Clear Standards Existed During the Relevant Time Period,
        Prosecution of Defendants Is Arbitrary .............................................................. 21

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Arriaga v. Mukasey,*
    521 F.3d 219 (2d Cir. 2008) ............................................................................. 22

*Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.,*
    660 F.3d 612 (2d Cir. 2011) ............................................................................. 22

*Dickerson v. Napolitano,*
    604 F.3d 732 (2d Cir. 2010) ............................................................................. 13

*F.C.C. v. Fox Television Studios, Inc.,*
    567 U.S. 239 (2012) ........................................................................................... 12

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................................................... 12

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ..................................................................................... 12, 22

*Mannix v. Phillips,*
    619 F.3d 187 (2d Cir. 2010) ............................................................................. 12

*Russell v. United States,*
    369 U.S. 749 (1962) ............................................................................................. 9

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012) ................................................................................. 8

*United States v. Allen,*
    Nos. 16-898-cr, 16-939-cr (2d Cir. July 19, 2017) ................................. *passim*

*United States v. Binday,*
    908 F. Supp. 2d 485 (S.D.N.Y. 2012) ................................................................ 9

*United States v. Bongiorno,*
    No. 05-cr-390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006) .................. 15

*United States v. Bryant,*
    556 F. Supp. 2d 378 (D.N.J. 2008) ........................................................ 13, 14, 15

*United States v. Finnerty,*
    533 F.3d 143 (2d Cir. 2008) ............................................................................. 16

*United States v. Finnerty,*
    No. 05-cr-393 (DC), 2006 WL 2802042 (S.D.N.Y. Oct. 2, 2006) .................... 15

*United States v. Gen. Dynamics Corp.,*
   644 F. Supp. 1497 (C.D. Cal. 1986) ................................................................ 14

*United States v. Hayward,*
   284 F. App'x 857 (2d Cir. 2008) ................................................................... 164

*United States v. Heicklen,*
   858 F. Supp. 2d 256 (S.D.N.Y. 2012) ....................................................... 8, 9, 20

*United States v. Lahey,*
   967 F. Supp. 2d 731 (S.D.N.Y. 2013) ............................................................. 13

*United States v. Lanier,*
   520 U.S. 259 (1997)............................................................................... 13, 15

*United States v. Mallas,*
   762 F.2d 361 (4th Cir. 1985) ....................................................................... 14

*United States v. Markoll,*
   No. 3:00-cr-133, 2001 WL 173763 (D. Conn. Jan. 24, 2001).............................. 14

*United States v. Pirro,*
   212 F.3d 90 (2d Cir. 2000) .................................................................. 9, 10, 14

*United States v. Rosenblatt,*
   554 F.2d 36 (2d Cir. 1977) ........................................................................... 9

*United States v. Rybicki,*
   354 F.3d 124 (2d Cir. 2003) ....................................................................... 12

*United States v. Stein,*
   473 F. Supp. 2d 597 (S.D.N.Y. 2007) ............................................................ 12

*United States v. Stringer,*
   730 F.3d 120 (2d Cir. 2013) .......................................................................... 9

*United States v. Thompson,*
   141 F. Supp. 3d 188 (E.D.N.Y. 2015) .............................................................. 9

*United States v. Ward,*
   No. 00-cr-681, 2001 WL 1160168 (E.D. Pa. Sept. 5, 2001) ....................... 14, 19, 21

*United States v. Whiteside,*
   285 F.3d 1345 (11th Cir. 2002) ................................................................... 15

*United States v. Yihao Pu,*
   15 F. Supp. 3d 846 (N.D. Ill. 2014) ................................................................ 8

*Upton v. S.E.C.*,
   75 F.3d 92 (2d Cir. 1996) ................................................................................................ 18, 20

**Rules**

Federal Rule of Criminal Procedure 12(b) .................................................................................. 1, 8

Defendants Matthew Connolly and Gavin Campbell Black ("Defendants") respectfully submit this memorandum of law in support of their amended motion to dismiss the United States Department of Justice's (the "Government") Superseding Indictment ("Indictment" or "SI"), pursuant to Federal Rule of Criminal Procedure ("Rule") 12(b).[1]

## PRELIMINARY STATEMENT

Defendants have been charged with wire fraud and conspiracy to commit wire fraud and bank fraud based on allegations that they caused Deutsche Bank AG ("Deutsche Bank") to make false and fraudulent London Inter-Bank Offered Rate ("LIBOR") submissions to the British Bankers' Association ("BBA"). During the period applicable to the charges, there was no governmental regulation of LIBOR, and the BBA, a private trade group, had sole responsibility for defining the parameters of appropriate LIBOR submissions.

At their core, all of these charges are based on the flawed premise that the BBA clearly defined LIBOR during the period charged in the Indictment—between 2004 and 2011. It did not. The BBA provided a single-sentence definition of the LIBOR rate in and around 1998, but provided no additional public guidance relating to the submission process for the next decade. This definition required LIBOR submissions to reflect the hypothetical rate at which a submitting bank could borrow funds. As the Second Circuit recently observed, the definition resulted in LIBOR submissions that were "necessarily imprecise" and permitted a "range of reasonable LIBOR submissions." By its plain terms, the BBA LIBOR definition provided no

---

[1] On the day Defendants originally filed this motion, the Second Circuit issued an 81-page decision in *United States v. Allen*, Nos. 16-898-cr, 16-939-cr (July 19, 2017), overturning the convictions of and dismissing the indictment against two LIBOR submitters, employed by Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), who had been charged on a theory similar to that which the Government has alleged here. The *Allen* decision represents the Second Circuit's first statement concerning LIBOR in a criminal matter and significantly impacts this case. At the July 25, 2017 status conference, the Court granted Defendants' request to amend this motion in light of *Allen*.

guidance on factors that banks could consider in arriving at rates within the range, let alone prohibited the conduct underlying the charges in this case, i.e., considering derivatives trading positions in making LIBOR submissions.

As the Government has already stipulated, it was not until June 2008—three months after Mr. Connolly left his employment at Deutsche Bank and the securities industry—that the BBA provided clarification around the definition of LIBOR and the submission process.  Significantly, the June 2008 clarification, like the LIBOR definition itself, did not prohibit banks from considering derivatives trading positions in making their LIBOR submissions.  In fact, such conduct was not prohibited until 2013—more than two years after the alleged conspiracy ended. Thus, there was no rule or definition that applied during the alleged conspiracy that prohibited the conduct at issue.

The Indictment fails as a threshold matter because it does not identify the BBA LIBOR rule (or any other BBA guidance) on which the Government purports to rely—nor could it, as none existed.  In addition, the Indictment fails as a matter of law because the BBA's LIBOR definition—which appears to be the basis for the alleged scheme even though it is not set forth in the Indictment—neither imposed a best estimate requirement nor prohibited consideration of derivatives trading positions in making LIBOR submissions.

The Indictment should also be dismissed because the wire fraud and bank fraud statutes as applied to this case violate the Due Process Clause.  Due process requires that a criminal statute give fair warning of the conduct that it makes a crime.  The law must be reasonably clear—***at the relevant time***—that a defendant's conduct was criminal.  In this case, there was no such clarity throughout the Indictment period.  There were no standards at all, much less reasonably clear ones, defining what could and could not factor into a submission or prohibiting

consideration of derivatives trading positions. Under these circumstances, there was no fair warning to Defendants that the alleged conduct rendered the LIBOR submissions false, fraudulent, or criminally punishable. Similarly, the lack of clear standards from the BBA invited arbitrary enforcement of the wire fraud and bank fraud statutes as applied here. For these reasons, Defendants respectfully submit that the conspiracy and wire fraud charges set forth in the Indictment as applied in this case are impermissibly vague, violate due process and should be dismissed.

## **BACKGROUND**

### A.    **Oversight of LIBOR**

The BBA is a private trade group based in London that represents approximately 200 banks from more than 60 countries. (SI ¶ 1.) During the period applicable to the Indictment—2004 to 2011—the BBA oversaw LIBOR, a benchmark interest rate, and established a LIBOR rate for 10 currencies, including United States Dollar ("USD"), across 15 different borrowing periods, i.e., "tenors," using the submissions of designated banks, known as "Contributor Panel" banks. (*Id.* ¶¶ 1-2.) In this role, the BBA had sole responsibility for defining the parameters of appropriate LIBOR submissions by the Contributor Panel banks, and it administered this responsibility without any government oversight. (*See, e.g.*, Declaration of Seth L. Levine ("Levine Decl.") Ex. A at 107 ("[T]he LIBOR definition was devised by the BBA, not a government agency, and the government never claimed otherwise."), Ex. B at Statement of Facts ("SOF") ¶ 2); *United States v. Allen*, Nos. 16-898-cr, 16-939-cr, slip op. at 11 (2d Cir. July 19, 2017) (stating that "there was no direct governmental regulation of LIBOR submissions"). In fact, the Financial Services Authority ("FSA"), the United Kingdom's financial enforcement agency, concluded that oversight of LIBOR was not within its regulatory purview because "contributing to or administering LIBOR" were not among the "regulated activities" of the FSA.

3

(*See* Levine Decl. Ex. C ¶ 152; *see also id.* Ex. D at c. 8, § 22 (LIBOR contributions not included among banks' "regulated activities")); *Allen*, slip op. at 11 n.12 (stating that the FSA recommended "comprehensive reform of LIBOR" and noting that no regulatory regime covered LIBOR).

Because the FSA determined that BBA LIBOR was outside the regulatory perimeter, a review of LIBOR in September 2012 set out a plan for its reform, which included implementing for the first time statutory regulation of the administration and submission of LIBOR and parameters for civil and criminal enforcement.  (*See* Levine Decl. Ex. E at 5); *see also Allen*, slip op. at 11-12 n.12 (citing the *Wheatley Review of LIBOR: Final Report* (Sept. 2012)).[2]  These measures were implemented on April 1, 2013.  (Levine Decl. Ex. E at 5.)  In February 2014, responsibility for LIBOR was transferred to a new administrator, the ICE Benchmark Administration ("IBA"), which, unlike the BBA, is specifically regulated by the Financial Conduct Authority ("FCA"), the successor organization to the FSA.  (*Id.*); *see also Allen*, slip op. at 11-12 n.12.  As part of the changes to the LIBOR process, the IBA was required to implement a "uniform submission methodology for LIBOR panel banks based on parameters defined by IBA and the LIBOR Oversight Committee" and to "publish a single, clear, comprehensive and robust LIBOR definition."  (Levine Decl. Ex. E at 3.)

### B.    The Charged Scheme

The Indictment charges Defendants with causing Deutsche Bank to make false or fraudulent USD LIBOR submissions to the BBA between 2004 and 2011.  (SI ¶ 26.)  According to the Indictment, these submissions were false and fraudulent in "representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the

---

[2] *Available at*: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf

submissions reflected rates that were designed to benefit their [i.e., Defendants' and co-conspirators'] trading positions." (*Id.*)  As described by the Court, the BBA then "unwittingly utilized those false statements to set various LIBOR benchmark rates in ways that allegedly favored DB's position in various derivatives trades, thereby causing losses to various third parties." [ECF No. 89 ("May 24 Order") at 4.][3]

Neither Defendant was responsible for making Deutsche Bank's USD LIBOR submissions.  (*See* SI ¶¶ 12-13); *see also Allen*, slip op. at 13 ("Each panel bank typically designated a particular employee to be principally responsible for submitting that bank's LIBOR contributions generally or for a particular currency or set of currencies.").  Rather, the Indictment alleges that Defendants either traded, or supervised other Deutsche Bank employees who traded, derivative products that referenced USD LIBOR.  (SI ¶¶ 10-11.)

Although the charges hinge on the alleged false and fraudulent nature of Deutsche Bank's LIBOR submissions, the Indictment fails to set forth the BBA's definition of LIBOR.  Instead, the Indictment describes LIBOR as an "averaging [of] the interest rates at which designated banks . . . estimated that they could borrow unsecured funds from other banks across ten currencies," after excluding the four highest and lowest submissions from Contributor Panel banks.  (*Id.* ¶ 2.)  The Indictment further alleges, without citation or source, that "[a] Contributing Panel bank's submission was to be an unbiased and honest estimate of that bank's

---

[3]   As shown in Defendants' motion to compel [ECF No. 106], there is substantial evidence that the BBA was aware of the conduct underlying the charges in this case, contrary to the Government's theory, and the Government has failed to produce this evidence to Defendants in violation of Rule 16 and *Brady*.  The *Allen* court stated that "[p]roblems with LIBOR were noted at least as early as a decade ago," by both "regulators and market observers" and were also "publicly reported."  *Allen*, slip op. at 4 n.1 (internal quotation marks and citation omitted).  As recently as last Thursday, the head of the U.K.'s Financial Conduct Authority, citing the sustained absence of active underlying interbank lending transactions, announced that LIBOR would be phased out in 2021.  (*See* Levine Decl. Ex. H.)

borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBORs." (*Id.* ¶ 8; *see* May 24 Order at 3 (stating that "[t]he gravamen of the charges against the defendants is that they participated in a seven year long scheme to manipulate the data that Deutsche Bank sent to the BBA, so that the submissions did not reflect Deutsche Bank's best estimate of its actual borrowing cost for that currency and tenor, but rather took into account the derivatives trading positions of defendants and their confederates").)

Even though the Indictment omits the BBA's LIBOR definition, that definition is undisputed. As the Government stipulated in its Deferred Prosecution Agreement with Deutsche Bank, and as the *Allen* court recognized, the BBA "defined LIBOR as: The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 [a.m.] London time." (Levine Decl. Ex. B at SOF ¶ 2 (alteration in original) (noting that "[t]his definition had been in place since approximately 1998")); *see also Allen*, slip op. at 12-13 & n.14 (reciting same definition and noting that definition existed from 2002 through 2008). As the *Allen* court described, this definition resulted in "LIBOR submissions [that] were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a 'range' of reasonable LIBOR submissions." *Allen*, slip op. at 22. Such "imprecision was exacerbated during periods of illiquidity in the interbank market, such as the financial crisis in 2007-2008." *Id.*

It is also undisputed that the BBA did not issue any guidance relating to the LIBOR submission process until midway through the alleged conspiracy in 2008—and only after Mr. Connolly left Deutsche Bank (SI ¶ 10) and the securities industry. The BBA stated that the 2008 clarification was necessary due to observed market confusion and a need for clarification around

the parameters for LIBOR submissions.  Specifically, the BBA explained in the consultative paper setting forth the clarification that:

> There is confusion amongst market commentators about what BBA LIBOR is for, and how it is constructed.  This is a serious issue and, therefore, the need to clarify the definition is evident both for users and observers in order that they understand fully the information that is being presented.

(*See* Levine Decl. Ex. F § 12.1.)

In fact, the Government stipulated that the BBA issued a "clarification" of LIBOR in June 2008, stating:

> The basis for a Contributor Panel bank's submission, ***according to a clarification the BBA issued in June 2008***, was to be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, believed that the bank could borrow unsecured inter-bank funds in the London money market.  Further, according to the BBA, a Contributor Panel bank should not have contributed a rate based on the pricing of any derivative financial instrument.

(Levine Decl. Ex. B at SOF ¶ 7 (emphasis added).)  The Government claims this guidance means that, as of June 2008, "a Contributor Panel bank's LIBOR submissions should not have been influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR."  (*Id.*)

Contrary to the Government's assertion, however, the BBA's June 2008 Guidance did not enumerate or provide clarification as to the factors that a Contributor Panel bank could consider in making its LIBOR submission.  (*See* Levine Decl. Ex. F.)  Nor did it prohibit Contributor Panel banks from considering their derivatives trading positions in making LIBOR submissions. (*See id.*)  Such a prohibition was not issued until 2013—two years after the end of the alleged conspiracy—when the BBA published its first Code of Conduct with respect to LIBOR, pursuant to the Financial Services Act, the first British law regulating LIBOR.  (*See* Levine Decl. Ex. G

§ 4.8.)  The BBA Code of Conduct, for the first time, called on Contributor Panel banks to

develop internal controls:

> Requiring individuals not involved in the LIBOR-setting process:
>
> – Not to contact submitters and reviewers to attempt to influence, or inappropriately inform, the contributing bank's submissions for any reason, including for the benefit of any derivatives trading positions [and]
>
> – Not to contact submitters and reviewers to seek information on the contributing bank's submissions prior to their submission to the LIBOR Administrator.

(*Id.*)  By 2014, oversight of LIBOR was turned over to the IBA, an independent organization

authorized and regulated by the FCA.  (*See* Levine Decl. Ex. E at 5, 19); *see also Allen*, slip op.

at 11-12 n.12.

## <u>LEGAL STANDARD</u>

Pursuant to Rule 12(b)(1), "[a] party may raise by pretrial motion any defense, objection,

or request that the court can determine without a trial on the merits."  Rule 12(b) permits a

defendant to challenge an indictment on the grounds that "the facts alleged do not constitute an

offense as a matter of law," including that it fails to allege a crime within the terms of the

applicable statute.  *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012); *see*

*also United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) ("[A] federal indictment can

be challenged on the ground that it fails to allege a crime within the terms of the applicable

statute."), *superseded by statute*, Theft of Trade Secrets Clarification Act of 2012, Pub. L. 112–

236, 126 Stat. 1627, *as recognized in United States v. Yihao Pu*, 15 F. Supp. 3d 846, 852 n.2

(N.D. Ill. 2014).  "Indeed, it would be a waste of judicial resources to conduct a trial, only to rule

on a post-trial motion that the government's theory of criminal liability fails, no matter what

facts it was able to establish at trial."  *Heicklen*, 858 F. Supp. 2d. at 262 n.5.

In analyzing a motion to dismiss an indictment under Rule 12(b), the Court must accept the factual allegations in the indictment as true. *Id.* at 263. The relevant question is whether the defendant's alleged conduct, accepted as true, is prohibited by the statute. *Id.* (holding that "[w]hether or not the Indictment charges an offense [] presents an issue of law determinable before trial"). In addition, to the extent a Rule 12(b) motion challenges the sufficiency of the Indictment, courts do not consider "facts" outside the four corners of the Indictment. *United States v. Binday*, 908 F. Supp. 2d 485, 491 (S.D.N.Y. 2012). However, consideration of rules or regulations underlying the alleged charges is appropriate. *See, e.g.*, *United States v. Pirro*, 212 F.3d 86, 90 (2d Cir. 2000) (consideration of tax code and regulations). In fact, when an indictment charges a crime that depends in turn on violation of another statute or rule, the indictment is defective where it fails to identify the underlying offense. *Id.* at 93 (dismissing charges of filing of false tax returns and determining that the filings were not false because the applicable tax regulations did not require the disclosure of the type of information that the defendant allegedly failed to disclose).

For "certain statutes specification of how a particular element . . . will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013) (citing, *inter alia*, *Russell v. United States*, 369 U.S. 749, 752 n.3, 759, 767 (1962)). For example, when the definition of an offense includes generic terms, such as fraud, "it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars." *United States v. Rosenblatt,* 554 F.2d 36, 41 (2d Cir. 1977); *see also United States v. Thompson*, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015).

## ARGUMENT

**I.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE THAT DEFENDANTS' CONDUCT VIOLATED A BBA LIBOR RULE**

The Indictment should be dismissed because it fails to allege a violation of any BBA LIBOR rule or requirement.  According to the Indictment, Defendants engaged in a scheme to cause Deutsche Bank to make false and fraudulent USD LIBOR submissions to the BBA.  (SI ¶¶ 25-26; May 24 Order at 3-4.)  Such submissions were false under the Government's theory of criminality because they did not reflect Deutsche Bank's "best estimate of its actual borrowing cost" and took into account its "derivatives trading positions."  (May 24 Order at 3.)  The Indictment is deficient because it does not identify any BBA rule that allegedly imposed these requirements—nor could it, as no such rule existed.

As a threshold matter, the Government's failure to identify in the Indictment any applicable BBA LIBOR rule or requirement governing the sufficiency of LIBOR submissions with the requisite specificity warrants dismissal.  *Pirro*, 212 F.3d at 93 ("[W]here an indictment charges a crime that depends in turn on violation of another statute, the Indictment must identify the underlying offense.").  The Indictment states that the LIBOR submission process was overseen entirely by the BBA.  (SI ¶ 1-3.)  Therefore, the Government acknowledges that whether a submission is "false" or "fraudulent" should be determined by reference to the BBA's LIBOR rule.  The Indictment, however, does not even identify any BBA rule or requirement, opting instead to substitute its own standards.  Absent specific reference to any BBA rule or requirement pertaining to the LIBOR submission process, the Indictment fails to sufficiently identify the charged offenses.

The problem facing the Government, however, is that no rule existed.  To the extent the Government claims that the BBA's LIBOR definition is the applicable rule, this definition did

10

not, as the Indictment alleges, impose a best estimate requirement or prohibit Contributor Panel banks from taking into account their derivatives trading positions in making their LIBOR submissions.   Instead, the BBA's LIBOR definition required the Contributor Panel banks, including Deutsche Bank, to submit a single number in response to the following hypothetical question:  what is "[t]he rate at which [you] *could* borrow funds, were [you] to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11:00 [a.m.] London Time."  (*See* Levine Decl. Ex. B at SOF ¶ 2 (final alteration in original) (emphasis added); *see also Allen*, slip op. at 12-13.   That is, Deutsche Bank was required by the BBA definition to submit a rate at which it "could" borrow funds, irrespective of whether such submission was Deutsche Bank's "best estimate" or took into account the bank's derivatives trading positions.  (May 24 Order at 3.)  Because the Indictment does not allege that Deutsche Bank's LIBOR submissions were actually false in that the bank *could not* borrow funds at the submitted rates, it fails to allege that Defendants engaged in a scheme to submit false and fraudulent LIBOR rates to the BBA.

The *Allen* decision provides further support for dismissal of the Indictment here because it rejects the Government's theory of the case.  As the Second Circuit stated in *Allen*:

> LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, ***there existed a "range" of reasonable LIBOR submissions***.   This imprecision was exacerbated during periods of illiquidity in the interbank market, such as the financial crisis in 2007-2008.

*Allen*, slip op. at 22 (emphasis added).  That is, according to the *Allen* court, the BBA definition did not require that each Contributor Panel bank submit a singular "best estimate" of its borrowing costs.  (*See* May 24 Order at 3.)  Rather, in its first statement concerning LIBOR in a criminal matter, the Second Circuit adopted a construction of the BBA LIBOR definition that

repudiates the Indictment's allegations concerning the LIBOR submission requirements.   The Indictment therefore fails as a matter of law and should be dismissed.

## II.   THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE STATUTES CHARGED, AS APPLIED TO THIS CASE, ARE IMPERMISSIBLY VAGUE

As applied to this case, the wire fraud and bank fraud statutes failed to provide Defendants with fair warning that their conduct could constitute a crime, and failed to provide sufficiently clear standards to prevent discriminatory enforcement.   The allegations therefore are unconstitutionally vague, and dismissal of the Indictment is warranted.

The question of whether a statute is constitutionally vague is a question of law.  *See, e.g.*, *United States v. Stein*, 473 F. Supp. 2d 597, 602-03 (S.D.N.Y. 2007).   Derived from the Constitution's guarantee of due process, a criminal statute that fails to clearly define the conduct it proscribes is impermissibly vague.  *See, e.g.*, *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).   A criminal statute is unconstitutionally vague if it: (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983).   Where, as here, the interpretation of a statute does not implicate First Amendment interests, it is assessed for vagueness only as applied to the specific facts in the case at issue.  *See United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003).

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Studios, Inc.*, 567 U.S. 239, 253 (2012).  As the *Allen* court made clear, if "we are to hale foreign men and women into the courts of the United States to fend for their liberty we should not do so

while denying them the full protection of a . . . right we regard as fundamental." *Allen*, slip op. at 55 (internal quotation marks omitted).

### A. Defendants Had No Fair Warning that the Alleged Consideration of Derivatives Positions Was Prohibited, Much Less Criminal

The wire fraud and bank fraud statutes, as applied to this case, are unconstitutionally vague because Defendants lacked fair warning that their alleged conduct constituted a crime. "There are three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997). First, the criminal law, both as written and as applied, must give a person of ordinary intelligence fair notice of what is prohibited. *Id.* Relatedly, the rule of lenity requires that the criminal statute be strictly construed so as to resolve any ambiguity such that it applies only to conduct that is clearly covered. *Id.* Finally, the fair warning standard bars a "novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* The "fair notice" test is objective. *See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 731, 743 (S.D.N.Y. 2013) ("[A] court must 'ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [person] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.'") (citing *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010)). Stated another way, the standard is not whether the statute is ambiguous; it is whether there is a reasonable construction of the statute or underlying duty that permitted the defendant's behavior. *See United States v. Bryant*, 556 F. Supp. 2d 378, 448 (D.N.J. 2008).

#### 1. The BBA Definition Must Have Provided Fair Warning to Defendants that the Alleged Conduct Was Prohibited

Where a criminal prosecution is based on a rule or duty not contained in a specific statute, the fair warning requirement extends beyond the statutory text and requires that the

underlying rule or duty be sufficiently clear so as to provide fair warning that the conduct at issue was prohibited.  *See, e.g.*, *Pirro*, 212 F.3d at 91.  As the Second Circuit has stated, a "[c]riminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal."  *Id.* (quoting *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985)).

To the extent those rules or duties may be set forth in sources beyond the statute charged, such as contracts, regulations, or agency opinion letters, it is proper for courts to consider them in assessing vagueness challenges.  *See, e.g.*, *Bryant*, 556 F. Supp. 2d at 444-45 (considering terms of contract in evaluating vagueness challenge and following *United States v. Gen. Dynamics Corp.*, 644 F. Supp. 1497 (C.D. Cal. 1986), which analyzed a contract in connection with a motion to dismiss the indictment, stating that "[i]f [the terms of the contract] make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence" (second alteration in original)); *United States v. Ward*, No. 00-cr-681, 2001 WL 1160168, at *1 (E.D. Pa. Sept. 5, 2001) (reviewing regulation and OSHA's Interpretation and Compliance Letters before concluding that an OSHA statute was impermissibly vague such that defendant could not have willfully violated it); *United States v. Markoll*, No. 3:00-cr-133, 2001 WL 173763, at *8 (D. Conn. Jan. 24, 2001) (reviewing Program Compliance Guidelines of Inspector General and Physicians Current Procedural Terminology in evaluating a vagueness challenge to Medicare-related mail fraud charges).

Here, whether Defendants' conduct is "false" and "fraudulent" (i.e., whether or not submissions could take into account derivative positions) depends on the violation of the BBA LIBOR definition.  Due process therefore bars criminal prosecution of Defendants unless that

14

definition "unambiguously prohibit[ed] [Defendants'] conduct, and the Indictment . . . so allege[s]." *Bryant*, 556 F. Supp. 2d at 444.  The Government also must "negative any reasonable interpretation of the [BBA definition] under which the alleged 'misrepresentation' is not false or misleading." *Id.* at 446; *see also United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretative question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.").  As the *Bryant* Court stated when addressing the application of the fair warning requirement to mail and wire fraud charges premised on the alleged violation of a medical center's bylaws:

> [I]f a reasonable construction of the [bylaws] (even if there was another, or even a more, reasonable construction), could validate [the defendant's] actions, it follows that he could not have had constitutionally sufficient notice that his conduct constituted the "scheme or artifice to defraud" alleged in the Indictment, i.e., one that was "in violation of the terms of the [bylaws]."  The Supreme Court's explication of the vagueness doctrine in *Lanier* is telling:  a statute does not provide fair notice if it is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  Given the basis for [the mail and wire fraud counts] of the Indictment, no less can be required of the [bylaws].

556 F. Supp. 2d at 447 (citations omitted).

This Court followed the same analysis in a series of cases alleging criminal securities fraud claims under the Securities Exchange Act based on an alleged violation of the New York Stock Exchange's ("NYSE") interpositioning rules.  *See, e.g.*, *United States v. Finnerty*, No. 05-cr-393 (DC), 2006 WL 2802042, at *7-8 (S.D.N.Y. Oct. 2, 2006); *United States v. Bongiorno*, No. 05-cr-390 (SHS), 2006 WL 1140864, at *9 (S.D.N.Y. May 1, 2006).  In denying the defendants' motion to dismiss based on due process objections, the Court held that the Government's theory of prosecution did not violate due process because "defendants' alleged actions constitute[d] ***clear violations*** of NYSE rules."  *Bongiorno*, 2006 WL 1140864, at *9

(emphasis added). Notably, the Second Circuit ultimately affirmed this Court's grants of judgments of acquittal in these cases, holding that a violation of NYSE rules failed to establish a deceptive act. *United States v. Finnerty,* 533 F.3d 143, 148-51 (2d Cir. 2008); *see also United States v. Hayward*, 284 F. App'x 857, 858 (2d Cir. 2008) (following *Finnerty* and reversing convictions of the *Bongiorno* defendants who were convicted at trial).

In this case, there was no applicable statute, statutory guidance, or rule regarding whether consideration of derivatives positions in LIBOR submissions was a crime. *See Allen*, slip op. at 11 & n.12 (noting that prior to 2013 "there was no direct governmental regulation of LIBOR submissions"). Rather, Contributor Panel banks' LIBOR submissions were only required to conform to the BBA LIBOR definition. *See id.* at 10-11. Therefore, to satisfy due process, the BBA definition must have provided fair warning to Defendants regarding the prohibited conduct alleged in the Indictment. It did not.

### 2. *The BBA Definition Does Not Provide Fair Warning*

Because the BBA LIBOR definition failed to provide Defendants with adequate notice that the alleged conduct was prohibited, the statutes, as applied in this case, do not satisfy the fair warning requirement and the Indictment therefore should be dismissed. In fact, there were no clear standards until after the end of the alleged conspiracy regarding the LIBOR definition and submission process.

During the first half of the alleged conspiracy—and indeed, for the entirety of Mr. Connolly's employment at Deutsche Bank—LIBOR consisted of a single sentence definition and nothing else. (*See* Levine Decl. Ex. B at SOF ¶¶ 2, 7); *Allen*, slip op. at 12-13 & n.14. This definition, cast in the form of a question, merely asked Contributor Panel banks to submit a single number in response to the following hypothetical question: what is "[t]he rate at which [you] ***could*** borrow funds, were [you] to do so by asking for and then accepting inter-bank offers

16

in a reasonable market size, just prior to 11:00 [a.m.] London Time." (*See* Levine Decl. Ex. B at

SOF ¶ 2 (final alteration in original) (emphasis added).)  The definition itself invites subjective

judgment and discretion by asking Contributor Panel banks where they "could" borrow funds.

Indeed, as the *Allen* court noted, the definition resulted in a LIBOR submission process that was

"necessarily imprecise" even in the best of market conditions.  *Allen*, slip op. at 22.

There was no additional guidance or direction beyond the BBA's LIBOR definition.  The

LIBOR submission process was left wholly undefined and unregulated as to, *inter alia*, (1) who

could serve as submitters; (2) what submitters could consider in arriving at their daily LIBOR

submissions; and (3) with whom and about what those submitters could communicate in

connection with formulating hypothetical LIBOR rates.  Additionally, while a "range of

reasonable LIBOR submissions" was permissible under the definition, the BBA did not provide

any corresponding guidance as to how Contributor Panel banks should select from within this

range in making their submissions.  *See Allen*, slip op. at 22 (BBA's LIBOR Manager stated that

LIBOR is "just a line in the sand" that is based on "[n]othing") (internal quotation marks

omitted).  Therefore, the BBA's LIBOR definition did not provide fair warning that, as charged

here, a LIBOR submission must reflect a bank's "best estimate of its actual borrowing cost," or

that consideration of its "derivatives trading positions" was prohibited or, more importantly,

potentially criminal.  (May 24 Order at 3.)

Significantly, the allegations in the Indictment that point to the false and fraudulent

nature of Deutsche Bank's LIBOR submissions—paragraphs 8 and 26—come straight from the

Government's interpretation of the BBA's June 2008 Guidance—***which was issued more than

four years after the start of the alleged scheme***.  (*Compare* Levine Decl. Ex. B at SOF ¶ 7, *with*

SI ¶ 8 (alleging that submissions should have been "an unbiased and honest estimate of . . .

borrowing costs" and should not have "reflect[ed] trading positions that stood to gain or lose based on LIBORs"), ¶ 26.)   The Government interpreted the June 2008 Guidance as imposing the requirement that "a Contributor Panel bank should not have contributed a rate based on the pricing of any derivative financial instrument."   (Levine Decl. Ex. B at SOF ¶ 7.)   The Government further interpreted the BBA's guidance to mean "[i]n other words, a Contributor Panel bank's LIBOR submissions should not have been influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR."  (*Id.*)

Thus, by the Government's own acknowledgement, nothing before June 2008 suggested that consideration of derivatives positions in LIBOR submissions could be problematic, much less criminal.  The Government has already formally agreed that the BBA's June 2008 Guidance was a "clarification" of the LIBOR definition.  (*Id.*)  In fact, in that June 2008 Guidance, the BBA expressly identified the "serious issue" of "confusion" in the market concerning how LIBOR was "constructed" in explaining why the association was offering a "clarification" of the definition.  (*See* Levine Decl. Ex. F § 12.1.)  With respect to Mr. Connolly, the lack of fair warning is particularly glaring because he left Deutsche Bank and the securities industry in March 2008, before the June 2008 Guidance was issued.  *See, e.g.*, *Upton v. S.E.C.*, 75 F.3d 92, 98 (2d Cir. 1996) (vacating the Commission's sanction order on vagueness grounds, finding that "the Commission took no steps to advise the public that it believed the practice was questionable until . . . after [he] had already stopped the practice" and explaining that "[t]he Commission may not sanction [a person] pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public").  With respect to Mr. Black, the lack of fair warning is particularly glaring because, as a citizen of the United Kingdom, he is facing prosecution here notwithstanding that his own government determined not to prosecute him and concluded that

the BBA LIBOR definition was not even a regulated activity during the relevant time period. *See Allen*, slip op. at 11 n.12, 55 (if "we are to hale foreign men and women into the courts of the United States to fend for their liberty we should not do so while denying them the full protection of a . . . right we regard as fundamental") (internal quotation marks omitted).

But even the BBA's June 2008 Guidance did not provide fair warning that the conduct underlying the charged scheme was prohibited.  The BBA's June 2008 Guidance did not impose a best estimate requirement.  (*See* Levine Decl. Ex. F.)  Nor did it prohibit consideration of a bank's derivative trading positions in making LIBOR submissions.  (*Id.*)  In fact, such prohibition was not issued until 2013, when the BBA published its first Code of Conduct with respect to LIBOR.  (*See* Levine Decl. Ex. G § 4.8.)

It violates due process to subject Defendants to criminal prosecution in 2016 for offenses that allegedly began in 2004 and ended in 2011, when the basis for characterizing Deutsche Bank's LIBOR submissions as false or fraudulent did not exist until 2013.  As neither British law nor BBA guidance expressly banned the conduct alleged here during the time period covered by the Indictment, there was no fair warning to Defendants at the relevant time—between 2004 and 2011—that their alleged conduct was criminal.  *See, e.g.*, *Ward*, 2001 WL 1160168, at *8, 11 (dismissing indictment where numerous OSHA interpretation letters failed to indicate that the conduct at issue was covered by the safety regulation); *id.* at *14 (noting the "grave misfortune" that OSHA provided "reasonably clear guidance concerning the applicability of the [regulation]" only after an explosion occurred).

### 3. The BBA Knew that LIBOR Submitters Considered Derivatives Positions But Did Not Take Any Action

As set forth in Defendants' motion to compel discovery filed at ECF No. 106, the BBA knew that financial institutions considered derivatives trading positions in making their LIBOR

submissions as early as 2005, but took no steps to prohibit such a practice until 2013—more than two years after the end of the charged scheme.  While consideration of such evidence is not necessary to hold that the Indictment fails as a matter of law, this evidence provides an additional justification for dismissal of the Indictment now, as opposed to wasting judicial resources and waiting until after trial.  *See Heicklen*, 858 F. Supp. 2d at 262 n.5.

If the BBA, the sole entity responsible for providing oversight of the rate—indeed, the authors of the definition of LIBOR—did not take any public steps to address, prohibit, or otherwise pursue the consideration of derivatives positions in LIBOR submissions as "violations," the Government cannot now be allowed to pursue criminal charges for the same conduct.  It is clear that the BBA could not have been deceived, given the evidence that it was aware of the conduct underlying the charges in this case for years.  [ECF No. 106.]  As the *Allen* court recognized, "[p]roblems with LIBOR were noted at least as early as a decade ago," by both "regulators and market observers" and were also "publicly reported."  *Allen*, slip op. at 4-5 n.1 (internal quotation marks and citation omitted).  For due process purposes, the fact that the BBA knew that the LIBOR submitters were considering derivatives positions is perhaps the clearest evidence that the LIBOR definition and submission process were, at the very least, too vague to support a criminal charge.  Moreover, the fact that the BBA knew of problems with LIBOR well before its June 2008 clarification, *see id.*—which neither imposed a singular best estimate requirement nor prohibited consideration of derivative positions—is further evidence that the BBA did not "unwittingly" utilize Deutsche Bank's LIBOR submissions.  (May 24 Order at 4.)

Subjecting Defendants to criminal prosecution in these circumstances violates due process and is fundamentally unfair.  Other courts have so found.  *See, e.g.*, *Upton*, 75 F.3d at 98 (holding SEC rule failed to provide fair notice where the SEC was aware of the behavior in the

marketplace for three years before issuing guidance banning the conduct, after the defendant's conduct had ceased).  The vagueness doctrine exists in part to prevent a defendant from being "penalized for violating a regulation the interpretation of which cannot be agreed upon by those who are responsible for its administration and enforcement."  *Ward*, 2001 WL 1160168, at *16 (dismissing indictment on vagueness grounds after OSHA exacerbated existing statutory ambiguities with confusing opinion letters).  This Indictment does just that.  Notwithstanding the explicit disclosures to the BBA, no one at the BBA publicly identified this conduct as problematic or as violating the LIBOR definition or any other BBA rule.  *See id.* at *5 ("The test is whether the language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice.") (internal quotation marks omitted).  The LIBOR definition remained unchanged, *see Allen*, slip op. at 12-13 & n.14, and, as conceded by the BBA's LIBOR Manager, LIBOR was "just a line in the sand" based on "[n]othing," *id.* at 22.

The BBA's silence as it repeatedly received this information demonstrates that LIBOR, and the submission process, lacked sufficient definiteness.  That even the BBA did not publicly state that this conduct was a violation of the LIBOR definition demonstrates that, at the very least, reasonable people of ordinary intelligence could have disagreed as to whether causing submitters to consider derivatives positions was unlawful, or whether such conduct fell within the parameters of the LIBOR definition.  The statutes, as applied to this case, fail the fair warning requirement.

### B.    Because No Clear Standards Existed During the Relevant Time Period, Prosecution of Defendants Is Arbitrary

The statutes, as applied, also fail to satisfy the discriminatory enforcement prong of the void-for-vagueness test, further warranting dismissal of the Indictment.   To satisfy the

21

"discriminatory enforcement" prong of the void-for-vagueness test, *see Kolender*, 461 U.S. at 357, the statute cannot be so vague as to reach a "substantial amount of innocent conduct" or to "confer[ ] an impermissible degree of discretion on law enforcement authorities to determine who is subject to the law." *Arriaga v. Mukasey*, 521 F.3d 219, 228 (2d Cir. 2008).  The statute must either (1) provide "sufficiently clear standards to eliminate the risk of arbitrary enforcement" or (2) "in the absence of such standards, the conduct at issue [must] fall[ ] within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Id*.

Where, as here, the BBA's LIBOR definition provided no standard whatsoever for how to formulate a LIBOR submission, the Government effectively has complete discretion to determine what factors might render a submission "false and fraudulent" and therefore what conduct may be subject to prosecution under the bank and wire fraud statutes. *See Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 622 (2d Cir. 2011) (finding ordinance void for vagueness where it failed to provide objective standard for compliance and therefore allowed arbitrary enforcement).  As discussed above, there were no standards set forth by the BBA (beyond its single-sentence definition) regarding the formulation of LIBOR hypothetical rates and the submission process for the period charged in the Indictment.  Even considering the BBA's June 2008 Guidance, which was issued midway through the charged conspiracy and months after Mr. Connolly left Deutsche Bank, there were no express prohibitions against communications with submitters and consideration of derivatives positions until 2013.  Thus, the statutes, as applied to this case, also fail the discriminatory enforcement prong of the vagueness analysis.

## **CONCLUSION**

For these reasons, Defendants respectfully submit that the Court should dismiss the

Indictment in its entirety and grant any and all further relief as may be just and proper.

Dated: New York, New York
      August 1, 2017

                                      Respectfully Submitted:

By: _S/ Kenneth M. Breen_            By: _S/ Seth L. Levine_
    (electronic signature with permission)      Seth L. Levine
    Kenneth M. Breen                  Miriam L. Alinikoff
    John P. Nowak                     Aaron I. Karp
    Phara A. Guberman
    Jane H. Yoon

**PAUL HASTINGS LLP**              **LEVINE LEE LLP**
200 Park Avenue                      650 Fifth Avenue, 13th Floor
New York, New York 10166         New York, New York 10019
Telephone:  (212) 318-6000        Telephone:  (212) 223-4400
Facsimile:  (212) 319-4090         Facsimile:  (212) 223-4425
kennethbreen@paulhastings.com   slevine@levinelee.com
johnnowak@paulhastings.com     malinikoff@levinelee.com
pharaguberman@paulhastings.com  akarp@levinelee.com
janeyoon@paulhastings.com

*Attorneys for Defendant Matthew Connolly*    *Attorneys for Defendant Gavin Campbell Black*